438 Pa. Superior Ct. 46 (1994)
651 A.2d 167
In re J.S.W.
Appeal of J.S.W., Appellant.
Superior Court of Pennsylvania.
Argued October 18, 1994.
Filed December 20, 1994.
*48 Leslie M. Gerstein, Philadelphia, for appellant.
Jay H. Ginsburg, Norristown, for S.W., participating party.
Judith Doherty, Wynnewood, for F.W., participating party.
Before CIRILLO, OLSZEWSKI and HESTER, JJ.
HESTER, Judge:
J.S.W., through her guardian ad litem, appeals from the order dated October 19, 1993, which denied the motion of the Department of Human Services ("D.H.S.") requesting a change in the goal of the family service plan from reunification to adoption. We reverse.
J.S.W. was born July 4, 1989, into a family which had been involved with D.H.S. since 1987. D.H.S. had received a complaint that Francine W., J.S.W.'s mother, and her husband, Steven W.[1], were on drugs and were neglecting their four children.[2] The four children were removed from the home and remained in voluntary placement outside the home from March, 1988, until April, 1989. Two months after the children returned to the home, J.S.W. was born.
On September 1, 1989, J.S.W., who was born with a cleft palate and required feeding through a gastric feeding tube, was admitted to the hospital for failure to thrive. Francine W. refused to participate in training in the use of the tube. Notes of Testimony ("N.T."), 10/19/93, at 64. Since the parents never visited the child and were involved with drugs, D.H.S. sought a restraining order to place J.S.W. in foster care. During this time, the other children in the family began residing with the maternal grandmother, as Francine and Steven still were using drugs and were transient. The family service plan then in effect offered a number of services including social work services to the children in their own home, drug and alcohol programs, psychiatric counseling, and *49 parenting classes. The goal at that time was reunification of the family.
In March, 1991, J.S.W.'s siblings were returned to the custody of Francine and Steven, and J.S.W. was returned in January, 1992. On July 24, 1992, J.S.W., who was three years old, was rushed to St. Christopher's Hospital with second and third degree burns over sixty percent of her body. Francine had immersed J.S.W. in scalding water and subsequently pled guilty to aggravated assault and endangering the welfare of a child. She was sentenced to ten years probation, the terms of which mandated that she attend a drug and alcohol program, agree to undergo a psychiatric evaluation, submit to random drug testing, attend parenting classes, and cooperate with D.H.S. A protective restraining order also was entered by the sentencing court mandating that Francine refrain from contact with J.S.W. That order remains in effect to this day.
J.S.W. remained at St. Christopher's Hospital two months, until September, 1992, when she was transferred to Children's Rehabilitation Hospital. On December 18, 1992, J.S.W. was adjudicated dependant and committed to D.H.S., retroactive to November 24, 1992. J.S.W. began residing with her present foster parents at that time. The family service plan in effect listed reunification as the goal. Although Francine was prohibited from seeing J.S.W., a restraining order, which had been entered against Steven, was lifted in December, 1992.
As of July, 1993, neither Francine or Steven were in compliance with the family service plan. Francine failed two random drug tests. Id. at 65. While the terms of Francine's probation required her to begin drug treatment in September, 1992, she did not begin such a program until March, 1993. She did not begin counseling until May, 1993. Once the restraining order was lifted for Steven in December, 1992, bi-weekly visits were scheduled for Steven and J.S.W.'s siblings. Steven initially refused to allow the siblings to visit, and he appeared for only one visit between December, 1992, and June, 1993.
In June, 1993, Catholic Social Services ("C.S.S."), the agency with whom J.S.W. was placed, held an individual service *50 plan meeting to review J.S.W.'s placement. Jennifer Mansfield, the social worker for C.S.S., testified that Francine told her it may be best for J.S.W., Francine, and the rest of the family if J.S.W. did not return home. Id. at 38. Mansfield testified that Steven testified that there was no reason to allow the other children to visit J.S.W. if she was not going to come home. Moreover, Francine was concerned about enduring embarrassment if her other children discussed the child abuse she perpetrated on J.S.W. with the neighborhood children. Id.
Based upon Francine's and Steven's history of noncompliance with the family service plans and the sentiments expressed at the June, 1993 meeting, D.H.S. scheduled a meeting for July, 1993, to change the goal from reunification to adoption. Sheila Dickens, a D.H.S. social worker, testified that Francine called and said she would not attend the meeting because it was raining. Id. at 17. She further stated that Francine said that she "didn't want to have anything to do with the child in any way, that she was concerned that the child would be afraid of her, and she didn't know whether the child was going to fit in her family system." Id. at 18. Steven told Ms. Dickens "that if the child wasn't going to be in his family, he saw no reason to come to the meeting." Id.
On October 1, 1993, D.H.S. filed a motion for a goal change from reunification to adoption. A contested goal change hearing was held on October 19, 1993, wherein the court received testimony from the D.H.S. and C.S.S. social workers, the foster mother, and both Francine and Steven W. At the conclusion of the testimony, Francine and Steven agreed to take a drug test; Francine's was negative, while Steven's was positive for TCH. Id. at 70-71. The hearing court entered an order maintaining the child's foster care status but denying the goal change to adoption. Thereafter, the guardian ad litem filed a motion for reconsideration which was denied on October 29, 1993. This appeal followed.
In this appeal, the guardian ad litem assails the court's decision denying the goal change to adoption, alleging that the *51 court failed to apply the best interest of the child standard and that the court's decision is not supported by the record. Thus, the decision adjudicating J.S.W. a dependent child is not under review herein. Once a child is adjudicated dependent, the issues of custody and continuation of foster care are determined according to a child's best interests. In the Interest of Sweeney, 393 Pa.Super. 437, 574 A.2d 690 (1990).
We consider whether it is indeed in J.S.W.'s best interest to continue in placement with a goal of reunification and whether such a conclusion is supported by the record. We examined the significance and interaction of the family service plan and designated goal established for a dependent child in In re Interest of M.B., 388 Pa.Super. 381, 386-87, 565 A.2d 804, 807 (1989), where we stated:
[T]he importance of the service plan and the goal it identifies for the child involved cannot be overemphasized. As we recently noted in an article appearing in the Children's Rights Chronicle, produced by the Juvenile Law Center:
. . . the family service plan is the key to the dependency process. It provides a social work tool which spells out a goal and everyone's tasks in reaching toward that goal. All parties to the plan should participate in its formation so that they understand the problems facing the family and also understand what is expected of them to remedy those problems.
By documenting what the parents, agency and other players in the process need to do, the FSP [the plan] is also legally valuable when efforts fail to reunify a family. . . . the lawyers should elicit testimony so that the court sees a parent's performance in reference to the guidelines spelled out through the FSP tasks. The court can thus determine when efforts toward reunification have been made but because of repeated lack of cooperation or failure, the necessary tasks cannot be performed and the goal should be abandoned.
Remarks of Sam Magdovitz of Juvenile Law Center, reprinted in Children's Rights Chronicle, Volume Six, No. 3, at 1 (1987-88).
*52 See also Matter of Luis R., 430 Pa.Super. 518, 635 A.2d 170 (1993).
The hearing court thoroughly and extensively examined the testimony in this case, and for this it is to be lauded. However, our review of the record reveals that certain actions and inactions on the part of Francine and Steven have been misrepresented and that improper conclusions have been drawn from the evidence. While the hearing court acknowledged that it is required to focus and evaluate the best interests of J.S.W., the court's opinion in support of its order, instead, focuses on the best interests of Francine and Steven. To be sure, there are no winners in this case; everyone, from the parents to the siblings, will suffer and be affected adversely by the outrageous and heinous acts of Francine.[3]
However, only the best interests of J.S.W. are to be considered herein. As an example of the trial court's misplaced focus, we note the hearing court's expressions of sympathy concerning the reference at the hearing to the fact that Steven is not the natural father of J.S.W. The hearing court assumed that Steven had never been told this fact, a conclusion that is not supported by the record. In fact, based upon the testimony of Sheila Dickens, the social worker for D.H.S., the paternity of J.S.W. obviously had been a matter under discussion before the hearing. N.T., 10/19/93, at 8. More importantly, however, the hearing court states that it "would be unfair to" Steven "to fail to provide him with an opportunity to verify" his paternity, and somehow, the court's denial of the goal change to adoption will enable Steven to accomplish this. Hearing Court Opinion, 3/25/94, at 12.
Regardless of whether Steven is the child's father or not, we believe the record supports the conclusion that Francine and Steven have demonstrated "too little, too late." Matter of Luis R., supra, 430 Pa.Super. at 525, 635 A.2d at 173. D.H.S. provided these parents countless opportunities to *53 remedy the factors preventing their reunification with J.S.W. Until the time of D.H.S.'s announcement that it would seek a goal change to adoption, Francine maintained that she did not want J.S.W. returned to her family. N.T., 10/19/93, at 17-18. She violated her probation twice by failing two random drug tests. Id. at 65. Steven, who was permitted to visit J.S.W. as of February, 1993, visited once between February and June 30, 1993. Id. at 30-31. While he visited more regularly after that, we note that those visits did not begin until Francine and Steven learned of D.H.S.'s intent to request a goal change to adoption. The following statement in In re E.F.V., 315 Pa.Super. 246, 253-54, 461 A.2d 1263, 1267 (1983), applies herein:
[T]he supporting children's agencies of the county have devoted two years of effort to rehabilitate the natural parents to the point where it would be safe to return [their child] to their custody. The natural parents have given a minimum of cooperation to these efforts, and have made little or no progress in correcting their deficiencies.
While Francine and Steven protested at the hearing that they were ready to change their ways, their actions speak more clearly and much louder than their words. We cite, for example, the drug test performed on the day of the hearing in which Steven tested positive for TCH. N.T., 10/19/93, at 65.
Notwithstanding the hearing court's sympathies for the natural parents, the focus of this case must center on the parents' efforts in complying with the family service plans. Clearly, the record is replete with examples demonstrating the inability or refusal of the parents to comply with the plans until D.H.S. announced its intention to seek a goal change. In light of the parents' failed efforts, especially Francine's two failed drug tests, the hearing court should have directed a permanency plan excluding J.S.W.'s natural parents. We stated in In Interest of Sweeney, supra, 393 Pa.Super. at 443, 574 A.2d at 692-93, quoting In re Quick, 384 Pa.Super. 412, 422 n. 2, 559 A.2d 42, 47 n. 2 (1989):
Permanency Planning is a concept whereby children are not relegated to the limbo of spending their childhood in foster homes, but instead, dedicated effort is made by the court *54 and the children's agency to rehabilitate and unite the family in a reasonable time, and failing in this, to free the child for adoption.
Francine blithely asserts in her brief that "there is no clock" running in this case, and that she "does not anticipate being permitted by any court to see her daughter, perhaps for several years." Francine's brief at 2, 3. To allow J.S.W. to languish in foster care, in light of the opportunities already afforded Francine and Steven over the past two years to comply with the family service plans, is directly contrary to applicable law. See In re E.F.V., supra. As we believe the decision of the hearing court is not supported by the record, we are constrained to reverse.
We also express our reservations about the trial court's undue reliance upon one of the stated purposes of the Juvenile Act, the preservation of the family. While deference must be given to this laudatory goal, deference should not become rigid adherence to the principle regardless of the circumstances; otherwise, adoption will never be an option regardless of the family situation and the best interests of the child. It is not suitable to continue to attempt to reunite J.S.W. with a family where the mother has stated that she does not want J.S.W. and where the father has taken no appropriate measures to demonstrate an interest in her. Further, while we concur with the trial court's observation that the bond of family love will enable most parents to provide their children with better care than anybody else, the evidence presented in this case clearly demonstrates that Francine and Steven W. are not better equipped to care for J.S.W. Indeed, the record reveals that neither Francine nor Steven stated that they love J.S.W., even though Francine testified that J.S.W.'s siblings and grandmother love her. N.T., 10/19/93, at 63.
Order reversed; Matter remanded to Court of Common Pleas of Philadelphia County to enter order consistent with this Memorandum. Jurisdiction relinquished.
NOTES
[1] Steven W. apparently is not the natural father of J.S.W. Notes of Testimony ("N.T."), 10/19/93, at 65. However, as Steven is the child's father of record in this case, we will refer to him as such in this appeal.
[2] J.S.W. and another sibling were born subsequently.
[3] In addition to immersing her child in scalding water, Francine allegedly locked her three-year-old in a closet and forced her to eat her feces. N.T., 10/19/93, at 29.