778 A.2d 670 (2001)
In re R.T., C.A., K.A.,
Appeal of G.A.(at 1694)
In re R.T., C.A., K.A.,
Appeal of K.A.(at 1704)
Superior Court of Pennsylvania.
Argued April 18, 2001.
Filed May 22, 2001.
*673 Gary G. Efstration, Lancaster, for G.A.
David J. Natan, Lancaster, for K.A.
Heather M. Harner, Mount Joy, for R.T., C.A., and K.A., appellees.
David E. Alspach, Lancaster, for Lancaster County Children and Youth Services, participating party.
Before TODD, OLSZEWSKI, and MONTEMURO,[*] JJ. *671
*672 MONTEMURO, J.:
¶ 1 Mother, G.A., and Father, K.A., appeal the Order entered September 2, 1999 in the Lancaster County Court of Common Pleas declaring their children C.A. and K.A., as well as Mother's son from a previous marriage, R.T.,[1] dependent, continuing them in the custody of Lancaster County Children and Youth Social Service Agency (Agency), and approving placement plan amendments for the children which establish a goal of adoption. In addition the court determined that an aggravating circumstance exists pursuant to 42 Pa.C.S.A. § 6302. Although we affirm that part of the Order declaring the children dependent and approving the placement plan amendments, we conclude that the court erred in applying the 1998 amendments to the Juvenile Act providing for a determination of aggravated circumstances. Accordingly, we affirm in part and reverse in part.
¶ 2 The trial court's Opinion recounts in detail the Agency's eight year involvement with Appellants' family[2]:
Events leading to the removal of [R.T.], [C.A.], and [K.A.] from [Appellants'] home occurred on February 26, 1998. The police received a referral from the Humane League that a number of animals were residing in the home and that conditions were unsanitary [sic]. When the police entered the home, they immediately noticed an odor of animals and feces. The police inspected the house. In the dining room, rabbit cages were found overflowing, with rabbit feces onto the table on which the cages were placed, as well as the floor. Located beside the rabbit cages was a playpen in which [K.A.] an infant, was laying [sic]. The dining room also contained a bird in a bird cage and a fish aquarium whose water was so dirty that it was difficult to ascertain whether there were any fish in the aquarium.
In the kitchen there was a caged dog, two turtles and an aquarium, a frog, *674 rabbits, and guinea pigs. There were animal feces on the kitchen floor and numerous cockroaches, both dead and alive. From the kitchen the police proceeded up a staircase on which cockroaches were climbing and where the police noticed smash marks on the wall where insects had been killed. The odor of animals and feces became stronger as the police reached the second floor of the house. The upstairs hallway contained cages of guinea pigs and hedgehogs, and there were feces on the hallway carpet. [Appellants'] master bedroom contained cages of guinea pigs and rabbits located on the tops of dressers and on the floor. These cages were overflowing with feces. There was also a plate sitting beside the bed with a half-eaten baked potato in which cockroaches were crawling all over the potato.
An inspection of the children's bedrooms found that [R.T.'s] bedroom did not contain any animals but there were feces on the carpeted area immediately outside of his door. R.T.'s room was extremely cluttered. There was a bare mattress on the floor serving as a bed and an exterior window in his room was broken with sharp edges of glass exposed. In what appeared to be a baby's room, the police found two cribs. One crib had no linens on it and the bare mattress was ripped. The second crib had linens on it that were dirty and soiled.
The Humane League removed approximately twenty (20) animals from the home on that day. The animals did not appear to be groomed or well-kept. [Appellants] and their children were told to leave the house and were placed in a hotel overnight.... The Agency went to [Appellants'] house a few days later to inspect it based on promises made by [Appellants] that it would be cleaned up. Animal feces had been cleaned from the floors and the animal cages had been removed, except for a bird cage, two aquariums, a frog container, and a turtle aquarium. Dead cockroaches were removed and the bedrooms had been cleaned and cleared of clutter. There were, however, dozens of live cockroaches still in the home. The stench of urine remained pervasive throughout the house.
Mother testified that there were twenty (20) animals in her home because she was obsessed with collecting them because they were cute and she could not help going overboard. Mother explained the condition of her house on February 26, 1998, as being caused, in part, by her Shop-vac breaking which did not enable her to sweep up the animal feces. She also stated that she was unable to keep up the amount of work twenty (20) animals entailed and that is why animal feces were found on the floors throughout her home. Mother admitted during testimony that her home was uninhabitable for children.
The Agency's involvement with [Appellants], and their children, dates back to August of 1990. In August of 1990, the Agency received a referral regarding the [family] because of problems Mother was having with post-partum depression following the birth of her child, Ashley. The Agency monitored Mother's depression and closed the case when her depression stabilized. The case was re-opened in April of 1992 when [Appellants] voluntarily placed their daughter Ashley for adoption and placed their newborn son, [K.T.] into foster care though Family Services. Mother was ambivalent about why the children were placed for adoption. She stated that she had numerous emotional concerns regarding the children. These concerns *675 being angry with the children, in one case feeling that the child was the devil, and having impulses to harm the children. The Mother stated that she had thoughts of throwing her children off of a bridge.
[Appellants'] fourth child, Brittany, was placed with the Agency when she was approximately seven weeks old after Mother threatened to throw her off of a bridge. Brittany was returned to her parents who subsequently voluntarily placed her for adoption with Family Services. Brittany was re-placed into the care of Family Services and returned home several times until Family Services refused to take her back into care because [Appellants] failed to sign a consent for adoption. Brittany was then placed with the Agency. [Appellants] parental rights concerning Brittany were involuntarily terminated on March 28, 1995. Brittany was adopted on August 30, 1996.
Taylor, [Appellants'] fifth child, was born on October 26, 1994, and on April 10, 1995, was hospitalized for malnourishment and failure to thrive. Taylor's height and weight were found to be significantly below what would be expected for a child in her age group. Tests were performed while Taylor was hospitalized to determine whether a medical reason existed that was causing the failure to thrive. No medical reason was given and therefore failure to thrive could only be attributed to environmental factors. While hospitalized, Taylor was able to gain at least one pound per week. Taylor was subsequently placed back in the home, re-hospitalized again for failure to thrive while in the care of her Parents, and was then placed into foster care until [Appellants'] parental rights regarding Taylor were voluntarily terminated on April 6, 1999.
In December of 1995, [R.T.], the oldest child, disclosed that he had been sexually abused by a neighbor. [R.T.] was admitted into the Hershey Medical Center Psychological Unit on July 18, 1996, for issues involving sexual abuse, Attention Deficit Hyperactivity Disorder, and Oppositional Defiant Disorder. Upon R.T.'s discharge, he was provided with intensive services through Philhaven Wraparound Program. The Agency provided services through referrals to counseling. [Appellants] attended one appointment. [R.T.] continues to receive a mobile therapist through Philhaven Wraparound Services, therapeutic staff support, after-school counseling, as well as individual counseling.
During the Agency's eight (8) year involvement with [Appellants'] family, [Appellants] have been provided with the following services: parent education courses, which included child development and behavior management, Penn State Extension services, S. June Smith Center services, Schreiber Pediatric Center, Visiting Nurse Association, Lancaster Guidance Center, Philhaven, Life Management Counseling, Ponessa and Associates Counseling Services, Adult Probation and Parole, Mental Health and Mental Retardation (MHMR), approximately ten (10) caseworkers have been assigned, at various times, to the family, intensive in-home Agency services, and various family service plans which were never successfully completed. [Appellants] have generally been uncooperative and resistant to the Agency and their services. The Agency has provided or referred [Appellants] with virtually every service available in Lancaster County and some referrals have been made more than once. Although [Appellants] successfully completed many of the programs offered, they have been unable or refuse to apply the information *676 learned to their situation and continue to be unable to safely parent their children.
Mother is diagnosed with asthma, spina bifida, for which she is receiving disability, major depressive disorder, recurrent with post-partum onset, for which she is currently being treated with Paxil, and she has borderline intellectual functioning. Although Mother receives Supplemental Security Income (SSI) benefits due to the spina bifida, the spina bifida does not prevent her from being employed. Despite these diagnoses, when Mother appeared in court she was extremely mobile and verbal. Father is diagnosed with adjustment disorder mixed with anxiety and depressed moods. Expert psychological testimony reveals that both Mother and Father have the ability to adequately parent regardless of their respective medical diagnoses.
(Trial Ct. Op. at 5-10) (citations and footnotes omitted).
¶ 3 On March 2, 1998, the Agency filed a Petition for Temporary Custody, based on the condition of the home on February 26th and the Agency's previous involvement with the family. The trial court granted the petition the same day, and, on March 3, 1998, held a hearing. Following the hearing, the trial court entered an order continuing the children in the care of the Agency until dependency hearings could be scheduled. On March 24, 1998, the Agency filed Placement Plan Amendments for the three children, recommending a goal of adoption for each of them. Dependency hearings were held on July 13, 1998, October 27, 1998, January 4, 1999, March 28, 1999, and April 26, 1999.[3]
¶ 4 On June 11, 1999, the Agency filed an Amended Petition for Custody alleging an Aggravated Circumstance as defined in 42 Pa.C.S.A. § 6302, namely that Appellants' rights to their daughter Brittany were involuntarily terminated in December of 1995. On June 21, 1999, the trial court entered an order granting the parties 21 days to request further testimony on the issue of aggravating circumstances, or 45 days to file a written memorandum on the issue; otherwise, the court noted that it would determine the existence of aggravating circumstances on the existing record. (Order, dated 6/21/99). Neither party responded. Accordingly, on September 2, 1999, the trial court entered an Order declaring R.T., C.A. and K.A. dependent children, continuing them in the care of the Agency, and approving the Agency's placement plan amendments providing a goal of adoption. Moreover, the court determined that the aggravated circumstance alleged in the Agency's Amended Petition for Custody existed, and therefore, a placement plan providing no return home was appropriate. This timely appeal followed.
¶ 5 Although Appellants ostensibly raise twelve issues for our review, only five are presented:
1) The trial court's finding that Appellants' children are dependent is not supported by clear and convincing evidence. See Appellant's Brief at 7, issue IX.
2) The trial court erred in applying the 1998 amendments to the Juvenile Act, incorporating the provisions of the federal Adoption and Safe Families Act (ASFA), because: (a) the provisions have retroactive application to Appellants; (b) the Agency waived application of the amendments *677 by failing to file a memorandum on the issue as directed by the trial court; (c) the Agency waived application of the amendments providing for aggravated circumstances because it failed to file allegations of aggravated circumstances within 21 days of its determination that they exist, and subsequently failed to serve its Amended Petition on Appellants; and (d) the Agency failed to prove aggravated circumstances by clear and convincing evidence. See id. at 6-7, issues I, II, VI, VIII, X and XI.
3) The trial court erred in approving placement plan amendments providing no return home of the children because (a) Appellants were precluded from participating in the development of the plans, in violation of 55 Pa.Code § 3130.61; (b) Appellants' due process rights were violated; and (c) the Agency provided no services to Appellants after the children were removed from the home. See id. at 6, issues III, IV, and V.
4) The trial court erred in failing to require the Agency to disclose its records to Appellants' counsel. See id. at 7, issue VII.
5) The trial court erred in raising a sua sponte hearsay objection to Mother's testimony. See id., issue XII.
¶ 6 Our scope of review in a child dependency case is broad. In Re C.J., 729 A.2d 89, 92 (Pa.Super.1999). However, we must accept those factual findings of the trial court which are supported by the record. Id. Because the trial judge is in the best position to observe the witnesses and evaluate their credibility, we accord great weight to her credibility determinations. In Interest of J.M., 438 Pa.Super. 409, 652 A.2d 877, 880-81 (1995) (quoting In Re M.K., 431 Pa.Super. 198, 636 A.2d 198, 201, appeal denied sub nom., 537 Pa. 633, 642 A.2d 486(Pa.), cert. denied, 513 U.S. 962, 115 S.Ct. 423, 130 L.Ed.2d 338 (1994)). "Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate." C.J., supra at 92.
¶ 7 First, Appellants challenge the trial court's finding that R.T., C.T. and K.A. are "dependent children" pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6301 et seq. The Act defines a "dependent child" as one who
is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk,....
Id. at § 6302, "Dependent child." at (1). "`Whether a child is lacking proper care and control encompasses two discrete questions: (1) Is the child at this moment without proper care or control? and (2) If so, is such care and control immediately available?'" Matter of Read, 693 A.2d 607, 609 (Pa.Super. 1997), appeal denied, 555 Pa. 708, 723 A.2d 1025 (1998) (quoting In re Jeffrey S., 427 Pa.Super. 79, 628 A.2d 439, 440 (1993)). The burden of proof is on the petitioner, in this case the Agency, to establish by clear and convincing evidence that proper care and control are not available. In the Interest of T.M., 456 Pa.Super. 140, 689 A.2d 954, 955 (1997).
¶ 8 Here, the trial court concluded that the allegations in the Agency's Petition for *678 Temporary Custody concerning the condition of Appellants' home on February 26, 1998 and the history of the Agency's involvement with the family were "unquestionably substantiated by the evidence presented at the hearings." (Trial Ct. Op. at 24). Even Mother admitted during her testimony that the house was "very, very dirty, very unkept" and was not appropriate for children. (N.T., 1/4/99, at 103, 154). She testified that housekeeping was not a priority at that time: "[r]ather than stay home first and tend to the house first [they] would rather go out shopping and do other things than tend to the house first." (Id. at 103). Therefore, "[b]ased on the condition of the home in which the children were residing with their parents," the trial court concluded that the children were without proper parental care and control. (Trial Ct. Op. at 25). We find no reason to disagree.
¶ 9 Moreover, we agree that proper parental care and control was not immediately available. Although Appellants claimed they cleaned their home the weekend after the incident, Agency caseworker Christine Reese testified that when she returned to Appellants' home on March 2, 1998, she found that it was not "substantially different than it had been on Friday, although the [Appellants'] did state they had cleaned all weekend." (N.T., 1/4/99, at 65). Ms. Reese explained:
It's correct that the feces was cleaned up off the floor and some of the bugs were swept up, but the stench of urine was just as strong on Monday as it was on Friday. I didn't consider it a clean home. I considered it clutter free as opposed to the condition that it was in on Friday when I had visited that home, but by no stretch of the imagination did I consider it to be a clean home. Although [Appellants] did, I did not.
(Id. at 43). Corporal Jack Mentzer, one of the responding police officers, testified that Mother was cooperative on February 26th, but "[s]he didn't really understand why we thought the conditions were as bad as they were." (N.T., 3/3/98, at 15).
¶ 10 Mother testified at the January 4, 1999 hearing that she and Father now split the housekeeping duties. See N.T., 1/4/99, at 113. However, the Agency, as well as the trial court, found their new commitment to housekeeping insincere. Indeed, the Agency's Director of Social Services, Patricia Lee, testified that Appellants were willing and able to complete placement plans when the children were in the Agency's care: "When there weren't children in care, the parenting deteriorated significantly so that it was our evaluation that while there was not a significant incentive for good parenting or safe parenting, it didn't happen." (N.T., 10/27/98, at 54). Therefore, we agree with the trial court's conclusion that R.T., C.A. and K.A. are dependent children under the Act.
¶ 11 Next, Appellants contend that the trial court erred in applying the 1998 amendments to the Juvenile Act in the present case. Specifically, they argue that the court's determination that "aggravated circumstances" exist, retroactively deprives Appellants of a vested right. We agree.
¶ 12 The Adoption and Safe Families Act (ASFA), which was enacted as part of the Social Security Act in 1997, "establishe[d] unequivocally that the goals for children in the child welfare system are safety, permanency and well-being." In Interest of Lilley, 719 A.2d 327, 334 n. 5 (Pa.Super.1998) (quoting Pennsylvania Office of Children, Youth and Families' Bulletin, XXXX-XX-XX) (emphasis in original). See 42 U.S.C.S. § 671. "The amendments make clear that the health and safety of the child supercede all other considerations." Lilley, *679 supra at 333. Pursuant to the requirements of ASFA,[4] the Pennsylvania legislature amended the Juvenile Act, 42 Pa.C.S.A. § 6301 et seq., effective January 1, 1999. The sections at issue in the present case concern the Agency's responsibility to provide reasonable efforts to reunite a dependent child with his or her family when certain enumerated, aggravating circumstances exist.
¶ 13 If the trial court determines that a child is dependent and that aggravating circumstances exist pursuant section 6302 of the Act, the amendments provide that "the court shall [then] determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as required in section 6351(e)(3) (relating to disposition of dependent child)." 42 Pa.C.S.A. § 6341(c.1). "Aggravated circumstances" include when "[t]he parental rights of the parent have been involuntarily terminated with respect to a child of the parent." Id. § 6302, "Aggravating circumstances." at (5).
¶ 14 Here, the trial court found that an aggravating circumstance exists since Appellants' parental rights to Brittany were involuntarily terminated in December of 1995. Because of this, as well as the Agency's eight year involvement with Appellants' family, the court approved placement plan amendments for the children which do not provide for a return home, but rather set a goal of adoption. Appellants argue that the trial court "retroactively applied the provisions of ASFA, as adopted into the [Juvenile Act[5]], to effectively deprive the Appellants of a vested right, their right to parent their children and be given a plan for the return of their children." (Appellants' Brief at 12).
¶ 15 There is a clear mandate by the legislature against retroactive application of a statute. See 1 Pa.C.S.A. § 1926 ("No statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly."). However, "[w]hile there is a presumption against retroactive application of statutes affecting substantive rights, a law is only retroactive in its application when it relates back and gives a previous transaction a legal effect different from that which it had under the law in effect when it transpired." McMahon v. McMahon, 417 Pa.Super. 592, 612 A.2d 1360, 1364 (1992).
Where ... no vested right or contractual obligation is involved, an act is not retroactively construed when applied to a condition existing on its effective date even though the condition results from events prior to that date ... `[A] statute is not regarded as operating retroactively because of the mere fact that it relates to antecedent events, or draws upon antecedent facts for its operation.'
Creighan v. City of Pittsburgh, 389 Pa. 569, 132 A.2d 867, 871 (1957) (quoting 50 Am.Jur. Statutes, § 476). A "vested right" is one that "so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." Black's Law Dictionary 1324 (7th ed.1999).
¶ 16 Clearly, Appellants' right to parent their children is a vested right. If we were to consider the involuntary termination *680 of Appellants' rights to Brittany an aggravating circumstance, and thus permit the court to conclude that the Agency need not make reasonable efforts to return the children home, it would effectively give "a previous transaction [i.e., the termination of Appellants' parental rights to Brittany,] a legal effect different from that which it had under the law in effect when it transpired." McMahon, supra at 1364. Prior to the enactment of the 1998 amendments, the involuntary termination of parental rights to one child had no direct application in a dependency proceeding for another.[6] Therefore, we find that the trial court erred in considering the termination of Appellants' parental rights to Brittany an aggravating circumstance in the present case.[7]
¶ 17 However, regardless of the applicability of the 1998 amendments, the court still was permitted to approve plan amendments which provided a goal of adoption. The court's approval of the plan amendments in the present case is the focus of Appellants' next issue. Preliminarily, we note that although the polestar of the Juvenile Act is reunification of the family, 55 Pa.Code § 3130.67 lists adoption as a permissible goal for a dependent child. See id. at (b)(9)(iii). See also In the Matter of Luis R., 430 Pa.Super. 518, 635 A.2d 170, 172-73 (1993), appeal denied, 538 Pa. 635, 647 A.2d 511 (1994) (noting permissible goals listed in 55 Pa.Code § 3130.67(b)(9), and explaining that "one goal is not mandated over another; nor does the language of the regulation require that each goal be implemented in the order in which they are listed."). A review of the trial court's September 2, 1999 Order and its Opinion following appeal reveals that the court found the placement plan amendments at issue here appropriate, regardless of the alleged aggravating circumstance.
¶ 18 Appellants first contend that they were denied the opportunity to participate in the development of the placement plan amendments for R.T., C.A., and K.A. 55 Pa.Code § 3130.61(d) requires that "[t]he county agency shall provide family members, including the child, their representatives and service providers, the opportunity to participate in the development and amendment of the service plan if the opportunity does not jeopardize the child's safety." Appellants argue that, pursuant to the mandate of § 3130.61(d), they should have been permitted to attend the Agency's Placement Review Committee meetings. See Appellant's Brief at 21. However, they provide no authority for their contention that they should have been invited to participate in the Agency's internal placement meetings. Moreover, the trial court found that Appellants were given the opportunity to participate in development of the plan amendments. Specifically, "[c]aseworkers assigned to [Appellants] had conversations with [them] regarding the Plan and they were asked if they had any thoughts as to something that could be added to the Plan. [Mother] responded to this inquiry by asking for a cleaning lady." (Trial Ct. Op. at 21 n. 15) (citations omitted). We agree that Appellants were provided with sufficient opportunity to participate in the development of the placement plan amendments; that they were unable to provide any meaningful input highlights the problem here.
*681 ¶ 19 Appellants also claim that they were denied their due process rights, although it is unclear from their argument on what they base this alleged constitutional violation. Apparently, they contend that they were denied procedural due process because the Agency failed to provide them with any services once the children were removed from the home, but, "instead chose to park the children in foster care pending a finding of `aggravated circumstances' by the court and the decision not to provide the parents with a plan." (Appellant's Brief at 19). Appellants' argument implies that the Agency deliberately denied Appellants available services until the amendments to the Juvenile Act, providing for aggravating circumstances, were enacted, thus, relieving itself of the obligation to work towards reunification of R.T., C.A., and K.A. with their parents. Appellant's conspiracy theory, however, has no basis in fact.
¶ 20 The trial court concluded that:
the request of the Agency to not offer a plan to [Appellants] for reunification was adopted by the Court based on the testimony concerning Agency involvement with [Appellants'] family for the last eight (8) years. Additionally, the Court found that "Aggravating Circumstances" existed due to the involuntary termination of [Appellants'] parental rights of their child, Brittany. Because of the repeated behavior on the part of the [Appellants], and because [Appellants] have repeatedly been offered services to maintain a home that does not fall below those "irreducible minimum standards", which they have failed to do, the recommendation of the Agency for a no return home is appropriate for the children and is in their best interests. To allow these children to languish in foster care while giving [Appellants] yet another chance to complete the goals on their placement plan not only defies common sense, but it is contrary to the applicable law and to the best interests of the children.
(Trial Ct. Op. at 23-24) (emphasis added). The trial court credited the testimony of Agency Director, Patricia Lee, who explained that over the preceding eight years, the Agency had offered, provided, or referred Appellants to every available and appropriate public service in the county, and the Agency's Placement Review Committee "could not realistically come up with a plan of action that hasn't already been attempted or provided that we believe would impact these people, these parenting skills." (N.T., 10/27/98, at 46). Ms. Lee stated that the Agency did not provide a plan for reunification "because history showed us that while these people were able to meet some goals some of the time, it apparently was not plausible for them to sustain that standard on an ongoing basis." (Id. at 64).
¶ 21 Appellants emphasize the fact that they have successfully completed some family service plans in the past. However, an agency is not required to provide services indefinitely when a parent is either unable or unwilling to apply the instruction received. "Once a child is adjudicated dependent, the issues of custody and continuation of foster care are determined according to a child's best interests." In Re J.S.W., 438 Pa.Super. 46, 651 A.2d 167, 169 (1994). In J.S.W., supra, the child, through her guardian ad litem, appealed the decision of the trial court denying the Department of Human Services' request to change her goal from reunification to adoption. This Court reversed on appeal, finding the record "replete with examples demonstrating the inability or refusal of the parents to comply with the plans until D.H.S. announced its intention to seek a goal change." (Id. at 170). Similarly, in In the Interest of M.B., 388 Pa.Super. 381, 565 A.2d 804 (1989), appeal denied, 527 Pa. 602, 589 A.2d 692 (1990), *682 we affirmed a trial court's decision permitting a goal change to adoption for the mother's four children. The trial court concluded that, despite the agency's best efforts, mother "seem[ed] incapable of mastering the simple, basic skill of parenting[.]" Id. at 810. We concluded that "the trial court has decided that CYS has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition[; I]n other words, the trial court order is the decision that allows CYS to give up on the parent." Id. at 808.
¶ 22 The same is true here. As caseworker Christine Reese testified, despite the many services provided to them, Appellants "still have not exhibited the ability to safely parent their children." (Id. at 24). The trial court concluded:
It is not reasonable to suggest that after eight (8) fruitless years of providing services to the Parents the Agency should be expected to continue providing the same services over and over again.... Minimum basic requirements for parenting have been clearly articulated to the Parents over the years in Placement Plan Amendments regarding their children. More than adequate support, personnel and time were provided by the Agency in furtherance of the goals on their various plans. Parents have demonstrated throughout the years with their involvement with the Agency, by their inability or refusal to complete the goals on their Placement Plan Amendments, and by the conditions upon which these children were placed, that they have made a conscious choice not to provide their children with the bare essentials of care and stability that they require despite the best efforts of the Agency.
(Trial Ct. Op. at 22-23). We find no reason to disagree. Accordingly, we affirm the trial court's order approving the placement plan amendments, which provide a goal of adoption.
¶ 23 Appellants also contend that the trial court erred in failing to order the Agency to disclose its records to Appellants' counsel. In its Opinion, the trial court noted that such disclosure generally occurs following a petition by the parents, and, in this case, "no petition requesting disclosure of the records was ever made upon this Court, therefore no order was issued by the Court directing the records to be disclosed." (Trial Ct. Op. at 27). Appellants fail to identify in their brief how or when they requested disclosure of the records. Therefore, we find the issue waived. See Pa.R.A.P. 2117(c) (requiring appellant to include in statement of case the place in the record in which issue was raised and preserved for appeal); 2119(e) (same for argument section of brief).[8]
¶ 24 Finally, Appellants challenge the trial court's sua sponte ruling during *683 the March 8, 1999 hearing that certain proposed testimony of Mother was inadmissible hearsay.[9] During the hearing, Mother began to testify as to what her treating psychologist told her about her new obsession with collecting Beanie Babies. (N.T., 3/8/99, at 32). The court inquired whether Mother's counsel intended to call the psychologist as a witness. (Id.). When counsel responded in the negative, the court excluded Mother's testimony as inadmissible hearsay. (Id.).
¶ 25 "`Questions concerning the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion.'" In Re Adoption of D.M.H., 452 Pa.Super. 340, 682 A.2d 315, 321 (1996), appeal denied, 547 Pa. 737, 690 A.2d 237 (1997) (quoting General Equipment Mfrs. v. Westfield Ins. Co., 430 Pa.Super. 526, 635 A.2d 173, 182 (1993), appeal denied, 537 Pa. 663, 644 A.2d 1200 (1994)). Appellants do not contend that the excluded testimony was not hearsay, rather, they argue that the court should not have precluded the testimony sua sponte, when the Agency and Guardian ad litum failed to object. We conclude, however, that the proposed testimony was inadmissible, and the trial court did not abuse its discretion in precluding it. See Lira v. Albert Einstein Med. Ctr., 384 Pa.Super. 503, 559 A.2d 550, 554 (1989), appeal denied, 527 Pa. 635, 592 A.2d 1302 (1990) ("To permit a physician's extrajudicial statement of medical opinion, made upon examination of a patient, to be received in evidence ... would run afoul not only of the hearsay exclusion but also of the rule which holds that expressions of medical opinion are generally inadmissible unless the physician expressing the opinion is available for cross-examination.").[10]
¶ 26 Therefore, we conclude that the trial court erred in applying the 1998 amendments to the Juvenile Act, defining aggravated circumstances, to the present case. However, we find no error in the court's adjudication of R.T., C.A. and K.A. as dependent children and its approval of the Agency's placement plan amendments providing for their adoption.
¶ 27 Order affirmed in part and reversed in part.
NOTES
[*] Retired Justice assigned to Superior Court.
[1] R.T.'s natural father, A.T., has not appealed the Order.
[2] The family consists of seven children. R.T. (born 8/20/88), Mother's child by her first husband, C.A. (born 10/9/95), and K.A. (born 5/1/97), Mother's children with Father, are the subjects of this appeal. The couple's rights to their other four children have been terminated: Ashley (born 8/30/90), voluntarily placed for adoption; Kyle (born 4/28/92), voluntarily placed for adoption; Brittany (born 6/16/93), parental rights involuntarily terminated; and Taylor (born 10/16/94), parental rights voluntarily terminated.
[3] At the October 27, 1998 hearing, the trial court granted the Agency's request to incorporate into the record the testimony from the termination hearings regarding Appellants' daughter, Taylor, held in August of 1998. See N.T., 10/27/98, at 7-8.
[4] 42 U.S.C.S. § 671(a) mandates that the states adopt the policies and procedures set forth in ASFA to be eligible for federal foster care and adoption assistance.
[5] In their brief, Appellants refer to the Child Protective Services Law, 23 Pa.C.S.A. § 6301 et seq., which applies to abused children. However, as there is no child abuse alleged in the present case, the Juvenile Act governs.
[6] However, we note that prior to the amendments a trial court certainly could consider the Agency's past involvement with a family when determining the appropriate placement for a dependent child.
[7] Accordingly, we need not address Appellants' remaining issues concerning the aggravated circumstances' determination. See Appellants' Brief at 6-7, issues II, VI, VIII, X and XI.
[8] We also note that Appellants fail to cite any authority for their claim that they are entitled to review the Agency's records. Although they do refer to a recommendation by the American Bar Association that attorneys representing private parties in the juvenile justice system have access to agency reports, see ABA Juvenile Justice Standards Counsel for Private Parties § 9.2(b), this "recommendation" is not binding authority in this Court. Moreover, the recommendation notes that "[i]f access to social investigation, psychological, psychiatric or other reports or information is not provided voluntarily or promptly, counsel should be prepared to seek their disclosure and time to study them through formal measures." Id. at § 9.2(b)(i) (emphasis added). This, apparently, Appellants failed to do. Although our review of the record reveals a Memorandum of Law filed by Mother's counsel on January 4, 1999, which argues why counsel should be permitted to review the Agency's records, there is no accompanying petition filed by Mother, nor any response by the trial court. Indeed, the issue was not even raised during any of the numerous hearings in this case. Therefore, even if Mother did request a review of the Agency's records through this Memorandum of Law, she abandoned this request by failing to seek a ruling in the trial court.
[9] Although Appellants, again, fail to direct this Court to the objected to ruling, the trial court sets forth the relevant citation in its Opinion. See Trial Ct. Op. at 27-28.
[10] Moreover, even if we were to conclude that the court should have allowed the testimony, any error is harmless as Mother had testified, without objection, to her psychologist's opinion regarding her Beanie Babies' infatuation during the August 25, 1998 hearing regarding Appellants' daughter, Taylor. See N.T., 8/25/98, at 435. The trial court granted the Agency's request to incorporate the testimony from these involuntary termination proceedings into the record in the present case. See N.T., 10/27/98, at 7-8.