# In re J. S.

*David Alspach,* for Children and Youth.
*Cynthia Garman,* for J. S.
*Gina Carnes,* for Mother.

*Pamela Brenaman,* for Father.

GORBEY, *J.,* November 20, 2007—

## PROCEDURAL HISTORY

E. F. (Mother) and R. S. (Father)[1] first came to the attention of the court on August 8, 2007 when a petition was filed by the Lancaster County Children and Youth Social Service Agency requesting temporary custody of J. S. (J.), then known as Baby Boy F., who had been born on August 6, 2007. J. was placed in the temporary care of the Agency on August 8, 2007 and a shelter care hearing was scheduled for August 10, 2007. The hearing scheduled for August 10 was continued at Father's request, and after a rescheduled hearing on August 15, 2007, the child was continued in the care, custody, and control of the Agency. The next hearing was scheduled for and held on September 12, 2007, after which the court issued an order finding J. to be dependent, found aggravated circumstances as to both Mother and Father and approved the child permanency plan of no return home.

On October 4, 2007, Father filed an appeal of the September 12 order to the Superior Court and on October 9, 2007, Mother filed a similar appeal. On October 10, the court ordered Mother to file a concise statement of the errors complained of on appeal, pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure. In the same order, Father was ordered to file an answer, specifically addressing those matters identified.

---

1. The Superior Court has provided separate docket numbers to Mother's and Father's appeals. This opinion is applicable to both actions since the parties and facts are so intricately entwined.

On October 9, the court ordered Father to file a concise statement of the errors complained of on appeal, pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure. In the same order, Mother was ordered to file an answer, specifically addressing those matters identified. Both parties filed a timely statement of matters complained of on appeal on October 25, 2007.

## FACTUAL HISTORY

Mother has had a long history with the Lancaster County Children and Youth Social Service Agency, extending back to 1989. (N.T. 5.)[2] The records of her past cases have been made a part of this record by agreement of the parties. (N.T. 28-29.) Her first child, R. R., went into foster care on December 18, 1990 and her rights to that child were terminated on April 2, 1992, because she failed to complete her reunification plan. (N.T. 5.)[3] A second child, A.V., was placed on October 25, 1991, and again Mother's rights were involuntarily terminated. (N.T. 5-6.) A. was adopted on December 22, 1993 and custody was released to the adoptive parents on December 28, 1993. (Decree dated December 28, 1993, 657 of 1991.)

On August 8, 1992, Mother called the Agency to request placement of her two children, S. S. and J. S., because she was in labor and had no one to care for them when she went to the hospital. The Agency placed the

---

2. The dateless cites to notes of testimony refer to the September 12, 2007 hearing involving J. Any cites to the record of past cases will contain date and docket number.

3. Names and dates not appearing in the testimonial record were obtained from the Agency petition for custody.

children with the paternal grandmother, where they remain. (N.T. 7, 15.)

On November 10, 1998, Mother again called the Agency to ask for assistance. She told them she had returned to Lancaster from Harrisburg with her two children to go into hiding from an abusive relationship and had nowhere to live. Both children, A. and A. B., had high lead levels which were untreated. The Agency took custody of the children and experienced difficulty with Mother's lack of commitment to visits, therapy and failure to distance herself from R. S. (N.T. 13-14, hearing of October 3, 2001, no. 373 of 1999.) Finally at a hearing on April 12, 1999, the court returned the children to Mother, conditioned upon her staying in the Bridge Housing Program in Harrisburg. (N.T. 12, hearing of April 12, 1999, no. 1209 of 1998.) Seven days later, Mother was discharged from the program for failure to cooperate through inadequately supervising her children on two occasions, verbally abusing a staff person and leaving against staff advice. She returned to Lancaster, and the children were again placed in the Agency's custody on April 21, 1999, with a finding of aggravated circumstances. Mother's parental rights were subsequently terminated and the two girls were adopted together in October of 2003. (*Id.* at 7.)

A fifth child, A. F., was permanently placed with relatives pursuant to a private agreement in 1998.

N. J. S. was born on January 22, 2002 and the Agency took him directly from the hospital. (N.T. 3, hearing of January 28, 2002, no. 44 of 2002.) His father was R. S., who had been Mother's boyfriend for several years and with whom she had a history of domestic violence. Ag-

gravated circumstances were found against both parents. Father never participated in an Agency assessment. (N.T. 8.) Father's parental rights were involuntarily terminated and Mother's voluntarily relinquished on May 12, 2004. (N.T. 15.) N. has been adopted.

J. S. was born on August 6, 2007 at home and was taken by the Agency one day later. Although Mother contended that she had broken off all contact with R. S. in 2004, J. was conceived on one occasion when, she explained, she accidentally ran into Father. (N.T. 10-11.) Both parents visit J. and act appropriately toward him. (N.T. 9.)

R. S. is the father of the last two of Mother's children. He has exhibited violence against Mother. On July 13, 2001 he shot at her and at a taxicab she was entering. (N.T. 5-6, October 3, 2001, no. 313 of 1999.) Two charges were brought against him, assault and recklessly endangering. (*Id.* at 7.) The charge of aggravated assault was withdrawn because Mother refused to cooperate with the police and refused to testify against Father. (N.T. 7-8.) Since then he has faced drug charges, possession of drugs and drug paraphernalia, simple assault and terroristic threats. As of the hearing in August of 2007, he was awaiting arraignment on drug charges. (N.T. 12.) When he lived with Mother he refused to fill out a form for a criminal check. (N.T. 56-57, hearing of October 3, 2001, no. 373 of 1999.) However, Father has told the Agency his life has moved in another direction. He has been living in a Christian group home since a month prior to the August 7, 2007 hearing and has been employed since September 4, 2007 in a clothing store. The home has regulations that their residents must have a positive lifestyle, working and attending church. (N.T.

12-13, 23.) Prior to living in the group home he had been in prison. (N.T. 23.)

Mother has had eight children prior to J. Three have been permanently placed with relatives. Her rights to one were voluntarily relinquished for purposes of adoption, and four others have been involuntarily terminated pursuant to Mother's failure to cooperate with her return plans. She failed to obtain stable housing or employment. She had lied to the Agency and to the court. She lied to the Agency during A.'s and A.'s case by denying her involvement with R. S. She told the Agency that R. S., who was not to be in the house with children, was her brother, not her live-in boyfriend, a lie that was discovered when the caseworker went to visit S. in prison and recognized the man she had met at Mother's house. (N.T. 16, hearing of October 3, 2001, no. 373 of 1999.) At other times she introduced him to a caseworker as a neighbor. (*Id.* at 65.) She lied to the court about her status with the Harrisburg Bridge Housing Program. (N.T. 34-40.) She has a history of relationships with violent men, Mr. S. only being the latest. (*Id.* at 28-29.)

Lately, however, Mother appears to have shown improvement and contends she has changed her life for the better. (N.T. 32.) She had a part-time job prior to J.'s birth. She has been in the same housing since February of 2007. (N.T. 10.) She receives Social Security disability because of anxiety, and has the support of her family. (N.T. 11.) She receives public assistance. (N.T. 16.) She was compliant with her prescribed prenatal care. (N.T. 18.) She has looked into budgeting and neighborhood services. (N.T. 18.) She does not plan on a future relationship with Father. (N.T. 10.) She has not had any criminal charges for two years. (N.T. 17.) Her only recent

drug test was negative. (N.T. 18.) The Agency presented the court with two options—either to provide a reunification plan for J. with Mother or to do a plan for J. alone. (N.T. 14.)

## ISSUES

(1) Whether a 3-month-old child can be adjudicated dependent and its mother given no reunification plan when this is Mother's ninth child to be removed from her care, five of whom to which her rights had been terminated, when Mother has a history of becoming involved with and protecting violent men, was often without a suitable home, did not supervise her children properly, and lied to the Agency and to the court about substantial relevant matters, despite the passage of several years since the last termination.

(2) Whether a 3-month-old child can be adjudicated dependent and his father given no reunification plan when Father's rights to his first child had been involuntarily terminated, he has a history of perpetrating domestic violence, had shot at the mother of the child several years before, had a criminal history of drug possession and use, assault, terroristic threats and has been in adequate housing only since the baby's birth.

## ANALYSIS

Under the Juvenile Act, a dependent child is one without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. 42 Pa.C.S. §6302. A determination of dependency depends upon the answers to two questions: (1) whether the child

at this moment is without proper care or control, and (2) if so, whether such care and control is immediately available. *In re R.T., C.A., K.A.,* 778 A.2d 670, 677 (Pa. Super 2001). There is little doubt that J. is a dependent child. He was taken immediately after birth because of Mother's and Father's substantially negative past histories. Mother has never supplied sufficient commitment or ability to parent or maintain eight prior children in her care and there is no new evidence that that commitment or ability to parent has been attained. Father has had his rights to his prior child terminated and has exhibited excessive violence against Mother, as well as having had a criminal history involving drugs, assault, and terroristic threats. Neither parent can provide appropriate care and control of J.

Additionally, aggravated circumstances are clearly present in both cases, since both parents have had their rights to prior children involuntarily terminated. 42 Pa.C.S. §6302. With a finding of aggravated circumstances, the court's examination takes on a new direction. As the Superior Court has explained:

"Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act, which was amended in 1998 to conform to the federal Adoption and Safe Families Act (ASFA). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments . . . place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including

the rights of the parents." *In re N.C., A.C. and L.C.,* 909 A.2d 818, 823 (Pa. Super 2006). (emphasis in original) (citations omitted)

In other words, the ASFA was "designed to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to long-term foster care or returning them to abusive families." *In the Interest of C.B. and A.L.,* 861 A.2d 287, 295 (Pa. Super, 2004).

The court must now consider whether Mother's and/ or Father's current apparent improvement has placed this particular child in a different situation so that a reunification plan is appropriate or whether a plan should be made only for J.'s future. The court has decided that the latter option is in the child's best interest.

### Analysis of Mother's Case

Since 1989, Mother has not shown an ability to parent appropriately. Eight children have been permanently removed from her care. The last time she cared for children, she failed to supervise them to such an extent that the Harrisburg Bridge Housing Program found that as part of the reason for her being expelled from their program. But now, Mother says she has changed. She has lived in the same apartment for eight months. She had a part-time job prior to J.'s birth. She receives SSI. She has looked into community services. She has family support. But all of these actions are new, all begun, it appears, since the onset of her pregnancy. And during this time she has not had the stress of a child in her care. She has not yet found a new boyfriend, who historically tend to be violent. There was no testimony concerning

her participating in counseling, which the court considers to be necessary. While Mother has made progress toward the goals of past permanency plans, her present parenting skills have not been addressed in the record and therefore remain as problematic as they were in her eight previous situations. She is not yet able to give this child permanency and stability, since clearly at least another six months in care is contemplated. The guardian ad litem, who supported a reunification plan, did not support an immediate return to Mother.

The Agency has presented the court with two options—one a reunification plan and the other a plan for J. should the court not want reunification. The court does not wish this child to have to undergo the problems that reunification with this particular mother would cause. She has apparently made some improvements in her life, as set out above. But the court does not believe that they are enough and is not sure that they are permanent and/or sincere.

Mother has a history of lying both to the Agency and to the court. Knowing that Father's violent tendencies were not acceptable to the Agency, she falsely denied that he was living with her, even going so far as to introduce him to a caseworker as her brother. The court is leery of her assertions that she is not now and will not in the future have a relationship with him. J. was conceived during a time when Mother denied a relationship with Father. Given Mother's penchant for presenting untruths to save herself from further problems, the court believes it to be more than possible that Mother and Father did not just accidentally run into each other and then produce a child after a "one night stand." She lied to the court about her involvement in the Bridge Housing

Program and still continued to insist at the last hearing she was truthful, although credible facts showed otherwise. In short, the court finds Mother to be a non-credible witness, whose word is not to be trusted.

If reunification were chosen, J. would remain in foster care, certainly longer than the next six months, waiting for Mother to complete her plan, a task which she has failed at least four times before, in order to retrieve custody of this child. Mother has waited too long to easily convince the court that she can finally be trusted to complete her plan in order to have J. returned to her. If she follows her past behavior, this child will remain in foster care, visiting with his mother and refused permanent placement. The operable statutes give this court the obligation to consider this matter from the point of view of providing the child with safety, permanency and well-being. The court does not believe that the relationship between Mother and Father is at an end, since it is not clear what will happen if she runs into him again, or no longer has her child's return to motivate her. After 18 years, the court does not see that Mother can complete her plan, including efficacious counseling, within the next year, which time frame jeopardizes the child's current relationships and permanency. A child's life simply cannot be put on hold in the hope that the parent will summon the responsibility of parenting. *In re N.C., A.C. and L.C.,* 909 A.2d 818, 824 (Pa. Super 2006). The court is concerned, because of Mother's propensity to paint reality as she wishes it to be, not as it is, that the welfare of this child will not be served by being connected to a mother whose behavior has been unpredictable and untrustworthy. The best interest of this child in terms of permanency and well-being is to be adopted into a lov-

ing, stable family, where he can grow up appropriately, not to be held in limbo while we wait to see if Mother has really altered her ability to care for a child.

### Analysis of Father's Case

J. is Father's second child to be without a reunification plan, the first having been N., to whom Father's parental rights were terminated. There is no question as to the action the court must take in this case in the face of aggravated circumstances. Father has a history of violence and criminal activity. He has treated Mother violently, shooting at her and the taxicab she was entering in 2004. He is involved with drugs not only in the far past, but awaiting arraignment for a drug charge as of August of 2007. He too informs the court that he has turned his life around, living in a Christian group home which requires moral behavior, and holding a job. But neither the home, nor the job are of long standing, the latter being only two months. This is a man who would not cooperate with an agency plan or criminal check in the past and cooperated with Mother in lying to the Agency about his identity. The court does not see that Father can reform at a fast enough rate. There is no evidence that his violent streak, or his propensity toward criminal activity has been permanently cured, and it is much too soon to place J. in a situation which will threaten his safety and well-being. And, as in Mother's case, waiting for Father to clear up all of his difficulties will be a negative for J.'s permanency. A reunification plan will not be given to Father.

Both appellants objected in their 1925(b) statements to the court's referring to past records. This is an objection without merit, since both parties agreed to the in-

corporation of those records during the September 12, 2007 hearing in this case.

Also, both appellants contend that their negative behavior of the past took place several years earlier, and should not now be considered. The court notes that that past behavior lasted over a long period of time and the improved behavior is very new. Neither party offered convincing evidence, professional or otherwise, that their improved behavior can be expected to continue. The court is loathe to risk J.'s welfare on a premature acceptance of Mother or Father's reform after so long a time of behavior antithetical to a child's well-being.

## CONCLUSION

For the reasons stated above, the court finds J. S. to be a dependent child and will not provide a reunification plan for Mother, E. F., or Father, R. S.

