**In re A.M.**

*Michael McHale,* for appellant.
*Deborah E. Spivack,* for appellee.

GORBEY, *J.,* July 12, 2012—

## Procedural and Factual History[1]

A. M. R. (mother) is the mother of A. M., born September 22, 1996, R. G., Jr., born June 29, 1999 and S. T. F., born November 27, 2008. A.'s father is R. M.-R., whose whereabouts are unknown. R.'s father is A. H., whose whereabouts are also unknown. S.'s father was thought to be S. L. F., about whom little is known except that he has a criminal history. But he was excluded by a genetic test, and mother now says that S.'s father is K. B., about whom little information is available. Mother has been involved with a child social service agency since 2003, when A. and R. were found to be dependent by the Berks county court, on account of unstable housing, mother's mental health problems, lack of parental skills, inappropriate physical discipline, anger management issues, lack of parental supervision and truancy. Berks county provided home services from February of 2003 to November of 2006, when the children moved to live with an uncle, where mother rarely visited. On July 23, 2007, A. and R. were placed in the legal and physical custody of the Berks county agency because the uncle had returned the children to mother, who still experienced the initiating problems. Mother had been diagnosed with Bi-polar and post traumatic stress syndromes but was not following medical recommendations.

Mother's history with the Berks county agency did not proceed well. She missed visits with the children and was inappropriate when she did come. In May of

---

1. Because of appellant's attorney's delay in timely ordering the transcripts, this opinion is being written without the benefit of verbatim testimony.

2008, she threatened to have the father of her two other children killed; criminal charges were filed and she was incarcerated between May 8, 2008 and May 24, 2008. She was discharged from Berks advocates against violence in December of 2008 as non-compliant. S. was born on November 27, 2008.

A.'s history showed a very troubled child. While living in a foster home, he urinated all over the bathroom, stored urine and feces, stole food and money, destroyed property, threatened other children, including R., and refused to do his homework. In 2007, he was partially hospitalized and medicated for disruptive behavior at school and he threatened suicide. He was placed in a therapeutic foster home, but his aberrant behavior continued. In July of 2009, urine and feces were found stored in his room, and his refusal to close the shower door caused the foster home bathroom floor to collapse.

R.'s behavior was equally troubling. In his Berks county foster home, R. urinated in inappropriate places, and cried himself to sleep every night. He has been diagnosed with ADHD, oppositional defiant disorder and depressive disorder.

On October 13, 2009 A. and R. were returned to mother under protective supervision, on the condition that mother cooperate with the children's mental health treatment. In February of 2010 mother moved with the children to Lancaster county and the case, now concerning all three children, was referred to the Lancaster county children and youth social service agency (the agency). The children needed mental health treatment and were

on various medications. After investigation, the agency learned that mother had not only stopped her own mental health treatment, but was no longer giving R. and A. their medications. The children's behavior in school was out of control and mother would not cooperate with the school. Her parenting was inappropriate. When the agency told mother she needed services, mother ordered the caseworker out of her house and refused to cooperate.

In March of 2010, R.'s behavior in school became maximally disruptive. He showed seizure-like behavior, rolling on the floor. On one occasion the other students had to be removed for their safety. When he received an in-school suspension, he entered a closet and wouldn't come out. His violent behavior continued to escalate. Mother did not answer the school's calls. R. now has an aid assigned to him. Between October of, 2009 and March of 2010, R. had 29 unexcused absences, 7 tardies and 8 days of suspension. During the same period, A. had 20 unexcused absences, 49 unexcused tardies and 3 days of suspension, one of which was for inappropriate sexual comments toward his teacher.

A dependency petition for all three children was filed on April 1, 2010. The Lancaster county court granted the agency's request for protective supervision on April 5, 2010, and the children were found to be dependent as of May 3, 2010. Mother failed to cooperate on her family service plan and the three children were placed in foster care on August 30, 2010.

Review hearings were held on August 30, 2010, December 20, 2010, February 28, 2011, July 22, 2011,

October 31, 2011, December 2, 1022, April 13, 212 and May 14, 2012.

Mother's compliance with her permanency plan was not consistent. At the review hearing on August 30, 2010 her progress was noted to be minimal in that she refused to sign releases for her mental health providers, canceled appointments for treatment and refused to provide documentation showing stable housing. She had also stated that she developed cancer of the knee, which understandably interfered with her activities. The children were removed from mother's home. At the permanency reviews on February 28, 2011, and May 16, 2011, she was said to have made substantial progress, but subsequently it was discovered that mother had a boyfriend, Manuel Iguina (Manny), and had been involving him with her children, a fact she had not disclosed to the agency. The agency had negative information concerning Manny both as to criminal activity and a history with the agency, and did not approve his contact with the children. Mother was specifically told that if she continued to live with Manny, the children could not be returned to her.

By the October 31, 2011 hearing, mother was again making only minimal progress. She was evasive with caseworkers. She had stopped therapy. She and Manny were living together and had applied for a marriage license, despite the agency's concerns about him. By December 2, 2011, mother had not only discontinued her mental health treatment but her personal parent trainer had terminated their relationship, because of mother's failure to cooperate. Family based services received through PA counseling were stopped by the provider because mother

had canceled several appointments with the family based workers. Mother still needed to provide proof of income and housing. After the May 14, 2012 hearing, the goal for S. and R. was changed to adoption, and the goal for A. was changed to APPLA[2].

The court had difficulties with mother's credibility throughout this matter. She professed to have cancer of the knee, but never presented any proof to the court. She lied in denying that Manny was living with her. She lied about her lack of cooperation, promising the court that she would sign waivers and perform various other tasks that were not completed. On other occasions, she stated she had done things required of her on her plan, which the court found out later she had not done. She lied about attending therapy sessions and blamed others for her shortcomings. She missed a couple of hearings, — once professing to have to attend chemotherapy and another time telling the caseworker before leaving the courthouse that she was finished fighting for her children. Given this history, it was difficult to make a decision as to the truthfulness of mother's testimony. Mother very well may have had cancer but because of how untruthful she has been over the length of the case, everything she says and does is suspect.

On June 13, 2012, mother filed her appeal of the May 14th, 2012 order to the superior court, and it is pursuant to this appeal that this opinion is being written.[3]

---

2. A. had decided that although he did not want his mother's parental rights terminated, he wanted to live permanently with his current foster parents, a plan approved by the court, upon the recommendation of the agency.

3. On May 1, 2012, the court had terminated mother's rights to S.

496

## ISSUES

Whether a change of goal from reunification to adoption is appropriate where Mother has a nine year history with a children & youth agency because of her lack of proper parenting, suitable living arrangements, her refusal to commit to therapy for her substantial mental health problems, and her failure to cooperate sufficiently with a parent trainer so that the trainer dismissed her as a client, her substantial non-compliance with her agency plan, her living with and planning on marrying a man with a history of involvement with children and youth agency and of criminal activity, and where the children had been in foster care for at least 24 months as of March, 2012, and who were showing improvement in their behavior as a result of their placement and appropriate remedial treatment for their mental health problems.

## ANALYSIS

A dependent child is:

> one who is without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotion health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other

and R. That decision was appealed to the superior court concurrently with this appeal, on June 13, 2012.

custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk. 42 Pa.C.S.A. § 6302

Given the facts of this case, which include mother's troublesome behavior since 2003, it is clear to the court that these are dependent children. Once dependency has been decided, the court must consider the statutorily mandated factors of 42 Pa.C.S.A. § 6351(f) at a subsequent permanency review hearings These are:

1. [To] determine the continuing necessity for and appropriateness of the placement;

2. [To] determine the appropriateness, feasibility and extent of compliance with the permanency plan developed for the child;

3. [To] determine the extent of progress made toward alleviating the circumstances which necessitated the original placement;

4. [To] determine the appropriateness and feasibility of the current placement goal for the child;

5. [To] project a likely date by which the goal for the child might be achieved;

6. [I]f the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the home or to preserve and reunify the family need not be made or continue to be made, [to] determine whether the county agency has filed or sought to join a petition to

terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child....

(In re N.C., 909 A.2d. 818, (Pa. Super 2006)

This last paragraph reflects the approach of the federal adoption and safe families act, which considers the amount of time a child has been in care as a specific and important element in a goal change decision.

"Essentially, the ASFA directs the emphasis away from the paramount importance previously enjoyed by parental rights to establish unequivocally that the goals for children in the child welfare system are safety, permanency and well-being... The legislative history of ASFA reveals that this act was designed to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to long term foster care or returning them to abusive families." *In the Interest of C.B. and A.L., Minors*, 861 A.2d 287, 295 (Pa. Super 2004)

The court considered all of the above-cited elements. There is no doubt that A., R. and S. need to remain in placement at this time. Mother's compliance with the plan is far from complete, and given the length of time she has been non-cooperative with her plan, the court has no way of predicting how long the children will remain in placement. At the moment, it appears that mother's lack of cooperation with the agency and lack of commitment to her plan dictate that the children will not return to her.

Once a child has been adjudicated dependent, additional decisions are made according to his best

interest. *In re J.S.W.*, 651 A. 2d 167 (Pa. Super 1994) The court cannot believe that prolonging the current difficult situation which has no discernible end in sight will serve these three children's best interests. Clearly, the intent of the legislature in providing the statutory instructions of section 6351(f) is to provide a reasonable amount of time — i.e., at least 15 months — for a parent to regain control of his or her life in order to have his or her child returned. But, the section also indicates that past fifteen months, the court must consider whether the odds are for or against the parents' regaining that control within a reasonable period of time so the child need not live with the uncertainty of where he or she will live. The odds are not in mother's favor.

As noted above, the court had difficulties with mother's credibility. Among the doubtful facts, was her unproven cancer of the knee. Also, she asserted that she missed two hearings first because she told her caseworker that she was undergoing treatment for that unproven cancer, and second that she was finished fighting for her children. She lied in denying that Manny was living with her. She lied about her lack of cooperation, promising the court that she would sign waivers and perform various other tasks that were not completed. She lied about attending therapy sessions when she did not. She blamed others, mainly the caseworkers, for her shortcomings. It was difficult to make a decision as to the truthfulness of mother's testimony; there were so many doubtful instances in this regard, that the court could not give great weight to her averments absent independent corroboration.

S. and R. have been in the custody of the agency since

March of 2010, a matter of at least 24 months on this latest placement. Mother has exhibited problems both physically and psychologically detrimental to the children since 2003, when the Berks county agency became involved with her. There is nothing to indicate to the court that she has conquered her difficulties. Despite some progress noted on two occasions, her regression to her troubled state indicates the inconsistency of her attempts to recover her children and leaves open the question of whether she will revert to non-cooperation. The court cannot today determine in the face of mother's unstable behavior whether any progress she makes is a real sign of progress and recovery, because past progress has never lasted. The behavior of all three children has improved in their current placements, and the court is not willing to risk that a return to mother in her current state will cause a mental health relapse for all three.

After examining the requirements of the statute, the court concludes that the children's current foster care placement is appropriate and feasible. The existing goal of reunification, given the children's difficulties and mother's lack of progress, is neither appropriate nor feasible. Mother had multiple opportunities to change her situation but chose not to, despite nine years of agency assistance. In fact, she made matters worse by adding Manny to the mix and being determined to marry him despite her knowledge that such an action will obviate the return of the children to her. The court is unable to provide a likely date for the goal of reunification to be achieved, and faced with only long-term negative behavior on

mother's part as set out above, and the improvement in the children's behavior while in the agency's custody, hereby changes the goal of R. and S. to adoption and that of A. to APPLA.