J-S73031-14
J-S73032-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: M.S. & B.J.S., : IN THE SUPERIOR COURT OF
Minors, : PENNSYLVANIA
:
:
:
:
:
APPEAL OF: J.S., Mother, : No. 1288 MDA 2014

Appeal from the Order entered on June 30, 2014
in the Court of Common Pleas of Lancaster County,
Juvenile Division, No(s): CP-36-DP-0000095-2012;
CP-36-DP-0000196-2012

IN THE INTEREST OF: M.S. & B.J.S., : IN THE SUPERIOR COURT OF
Minors, : PENNSYLVANIA
:
:
:
:
:
APPEAL OF: R.S., Father, : No. 1289 MDA 2014

Appeal from the Order entered on June 30, 2014
in the Court of Common Pleas of Lancaster County,
Juvenile Division, No(s): CP-36-DP-0000095-2012;
CP-36-DP-0000196-2012

BEFORE: BOWES, WECHT and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J: **FILED APRIL 15, 2015**

In these consolidated appeals, J.S. ("Mother") and R.S. ("Father") (collectively "the parents") appeal from the Dispositional Order[1] concerning their two minor children, M.S., born in November 2010, and B.J.S., born in November 2012 (collectively "the Children"), which ruled that it was not in

_____

[1] The single Dispositional Order, which pertains to both Mother and Father, is dated June 30, 2014.

the Children's best interest for their permanency plan to include a reunification plan concerning the parents. We affirm.

The trial court thoroughly set forth the relevant facts and procedural history underlying this appeal in its Pa.R.A.P. 1925(a) Opinion entered on March 17, 2015. *See* Trial Court Opinion, 3/17/15, at 1-6.[2] We incorporate the trial court's recitation herein by reference. *See id.*

On appeal, Mother presents two issues for our review:

A. Whether the trial court erred when it failed to provide Mother with a child permanency plan for reunification with [the C]hildren?

B. Whether the trial court erred in finding [that] Mother abused M.S. and B.J.S.?

Mother's Brief at 9.

Father presents the following issue for our review: "Whether the trial court erred when it failed to provide Father with a child permanency plan for reunification with [the C]hildren[?]" Father's Brief at 9.

The parents argue that the trial court improperly refused to order a permanency plan for reunification following this Court's remand in December 2013. *See id.* at 12-14; Mother's Brief at 14-18. The parents contend that the trial court's omission was improper because (1) this Court previously found that no aggravating circumstances existed; (2) the parents have made progress in improving their parenting skills, and have participated in

---

[2] We observe that Mother's oldest child, J., the subject of the physical abuse by both Mother and Father, is not implicated in the Dispositional Order on appeal.

programs offered by the Lancaster County Children and Youth Service Agency ("the Agency"); and (3) the Agency inappropriately failed to give the parents a "second chance," despite the Children's adjudication of dependency. *See* Father's Brief at 12-13; Mother's Brief at 14-18. Mother also argues that the trial court erred in finding that she had abused the Children, as such finding is not supported by the record. *See* Mother's Brief at 15-16, 19.

Our standard of review is as follows:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

> * * *

> [A]ppellate courts must employ an abuse of discretion standard of review, as we are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually … they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

Here, in the trial court's Pa.R.A.P. 1925(a) Opinion entered on August 21, 2014, the court thoroughly addressed the parents' claims, discussed the applicable law, and determined that the court properly denied the parents a reunification plan concerning the Children based upon (1) Mother and Father's respective prior physical abuse of J.; (2) the parents' lack of progress in their respective parenting plans; and (3) the trial court's finding that making the Children available for adoption, and providing them permanency in a safe environment, would serve their best interests. **See** Trial Court Opinion, 4/21/14, at 7-10. Our careful review confirms that the trial court's analysis is supported by the record and the law, and we adopt it for purposes of this appeal. **See id.** The trial court properly exercised its discretion in determining that reunification is not appropriate and is not in the Children's best interests. **See In re R.J.T.**, 9 A.3d at 1190 (providing that an appellate court must defer to the trial court judge who has presided over several other hearings with the same parties and has a longitudinal understanding of the case and the best interests of the individual children involved); **see also In the Interest of: D.C.D.**, *105 A.3d 662, 676* (Pa. 2014) (where the agency had failed to employ "reasonable efforts" to reunify a child with her parent, holding that permanency for a child may not be delayed because of such failure "when a court has otherwise held that grounds for termination have been established and the court has determined

that termination is in the best interests of the child by clear and convincing evidence.").

Additionally, pursuant to this panel's directive in our February 19, 2015 Judgment Order, the trial court, in its Pa.R.A.P. 1925(a) Opinion entered on March 17, 2015, thoroughly discusses the enumerated factors that a court must consider concerning evidence issued at a permanency review hearing, as set forth in 42 Pa.C.S.A. § 6351(f) and (f.1). **See** Trial Court Opinion, 3/17/15, at 7-10. We incorporate the trial court's detailed discussion herein for purposes of this appeal. **See id.**

Based upon the foregoing, we conclude that the trial court properly exercised its discretion in refusing to require reunification in the permanency plan for the Children, where the parents had previously twice abused J., and reunification was not in the Children's best interests.

Dispositional Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/15/2015

- 5 -

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
JUVENILE DIVISION

IN THE INTEREST OF:                    :    SUPER. CT. NO.: 1288 MDA 2014
                                       :
M. S., A Minor                         :    DOCKET NO.: CP-36-DP-95-2012
B. J. S., A Minor                      :    DOCKET NO.: CP-36-DP-196-2012

---

IN THE INTEREST OF:                    :    SUPER. CT. NO. 1289 of 2014
                                       :
M. S., A Minor                         :    DOCKET NO.: CP-36-DP-95-2012
B. J. S., A Minor                      :    DOCKET NO.: CP-36-DP-196-2012

By: Leslie Gorbey, J.

## OPINION SUR APPEAL AND ON REMAND

### FACTUAL HISTORY AND PROCEDURAL HISTORY

Three sisters are involved in this case: J. R. (J.), born September 15, 2007, M. S. (M.), born November 22, 2010, and B. J. S. (B. J.), born November 11, 2012. J. S. (Mother) is the mother of all three girls. R. S. (Father) is the father of M. and B. J., and the step-father of J.. S. R. is J.'s biological father.[1]

At the time of J.'s birth, Mother was single. She subsequently married R. S. When J. was nine months old, she was indicated as abused by the Lancaster County Children and Youth Social Service Agency (Agency). Her injuries, as described in a Commonwealth Court opinion, included bruising and swelling of the left side of her head, bruising near the right temporal region, bruises on both sides of her neck, a large bruise on the rib cage, a buckle fracture of the left tibia and a fracture of the left 8th rib. *R.S., Jr. v. Department of Public Welfare,* No. 1947 C.D. 2010 (April 1, 2011).

---

[1] S. R. did not file an appeal.

1

Protective Service Plan was put in place. (N.T. 9/17/12, 48) Father was indicated as the perpetrator of this abuse on August 1, 2008, and J. was placed informally by agreement, with her maternal grandparents. Father appealed to the Commonwealth Court, which affirmed his status as perpetrator. (*R.S., Jr. V. Department of Public Welfare, supra*) On June 18, 2010 the protective services case was closed. Mother has never believed that Father was a perpetrator.

Mother gave birth to M. S. on November 22, 2010. Although the infant was permitted to go home with Mother and Father, a safety plan was established by the Agency, providing that Father was to have no unsupervised contact with her. (N.T. 1/7/13, 95) The Family Service Plan was formulated and provided that both parents be evaluated for parental competence. After J.'s first abuse discussed above, Mother had seen a therapist, John Weigel, as part of her plan. He found Mother functioning at a borderline intelligence range and had serious concerns about her ability to function as a parent. He recommended individual counseling to address the relevant issues. He was also concerned about her failure to accept Father as the perpetrator. His test results show that Mother had a high score on the scale indicating false answers.

Mother next saw Dr. Gransee, a psychologist, for a parenting assessment in May of 2011; his evaluative report recommended parent training. On August 20, 2011, a Personal Parent Trainer (PPT) was assigned to the Ss'. After some time, the parents seemed to be making progress, and J. returned to live with her mother, her step-father and her sister in January of 2012. The PPT, who was to stay to support the reunification, was discontinued early when J. was abused for the second time in early March of 2012. On March 16, 2012, Mother took J. to see a physician and told him that

2

bruises on the child happened during a nightmare when J. threw herself against a wall. (N.T. 9/17/12, 77) The Agency received a March 23rd call from Mother to tell them that J. had banged into the bedside wall during a nightmare and had been injured. When the caseworker went out to the house to investigate, she found that the child had black eyes, bruising and lacerations to her face. She took photographs. (GAL's Exhibit 1). Mother reported that she had gone into J.'s room alone after hearing J. scream, and believed that J., in the throes of a nightmare, had slapped or punched herself in the face, or banged her head, face first, against the wall. (N.T. 1/7/13, 114 *et seq.*, 131) Mother did not see these things happen; it was a supposition or fabrication on her part. Father did tell his mother-in-law that Mother was hitting J.. (N.T. 7/30/212, 287) Mother told the police that the medication she was on could have caused the incident, but she later denied having said that. (N.T. 7/30/12, 166). Mother insisted that J. had frequent nightmares or "night terrors." She told an Agency caseworker that "J.'s nightmares were getting worse... And they were going to be taking J. to the doctor because of concerns that J. may be having some kind of seizures because she shakes so violently during the nightmares." (N.T. 7/30/12, 354) The resource mother told the Court that J. had had no nightmares or other nighttime disturbances while with her. (N.T. 7/30/12, 197-198) In addition, when M. S., the child's aunt, brought J. to see Dr. Hoshauer for an investigation of abuse, she said nothing about J. having sleep problems, although she was specifically asked. (*Id* at 230) Mother also went out of her way to hide the injured child from others. During the week immediately following the injury, she did not take J. to the doctor for treatment for the injuries, canceled her meetings with the PPT, and kept J. home from school. (N.T. 1/7/13, 144) She did not keep an appointment for an

3

investigative meeting with the police. (N.T. 7/30/12, 167-169)) She told the Court that the doctor had been unavailable when she called, but she admitted she did not then seek alternative care such as an Emergency Room visit. (*Id* at 144-147) A Shelter Care Order triggered by the March, 2012 abuse was issued by the Lancaster County Court on May 1, 2012. On May 10, 2012, temporary custody of M. was also given to the Agency, Mother was named as a perpetrator of abuse against J. and both children were placed by the Agency. Father was named as a perpetrator by omission because he had indicated to his mother-in-law that Mother had been hitting J.. (N.T. 7/30/12, 287) On May 14, 2012, a scheduled hearing was continued because Father's attorney was unavailable. On May 18, 2012, M. was placed in an Agency approved resource home with J.. A safety plan provided that J. and M. would live with their paternal aunt M. S. and have only supervised contact with Mother and Father. A CASA was appointed for the case on May 22, 2012. Unfortunately, the aunt's significant other did not want to be a permanent resource for the child, so on June 18, 2012, after a hearing, the order was modified and the children were placed in foster care.

On July 30, 2012, and September 17, 2012, hearings were continued because of a lack of time to complete testimony. On September 20, 2012, the girls' placement was modified after hearing, and they were moved to live with their maternal grandparents. Mother was permitted to visit only in her parents' house. Hearings were held on October 1 and 14, December 6, 2012, and January 7, 2013 in order to complete testimony.

Mother informed the Agency on October 11, 2012 that she was again pregnant and her third child was born on November 11, 2012. The Agency took

4

custody of the newborn, B. J., and placed her in an agency approved resource home. These foster parents are willing to be a permanent resource for the little girl.

The Court received expert testimony from Cathy Hoshauer, M.D., a pediatrician and an expert in the evaluation of child abuse victims. (N.T. 7/30/12, 203 *et seq.*) Dr. Hoshauer had seen J. and reviewed an interview of her by a forensic interviewer concerning the injuries. She subsequently prepared a report, in which she concluded that the injuries sustained by J. were inconsistent with her hitting her head on a wall. (*Id.* at 215 *et seq*; Petitioner's Exhibit 1) She explained further that "if you bump your head against a wall, you're not going to get injuries in multiple different places. So her injuries were her mouth, below her eye, above her eye and hemorrhage within the eye, and that's not something that will - - that a child can create enough force on their own." (N.T. 7/30/12, 223-224) She also responded negatively when asked if she had ever seen a child of four or so who was able to self-injure themselves with their own hands or other body parts to cause purple bruising on their face. (N.T. 7/30/12, 219)

On March 20, 2013, aggravated circumstances were found as to Mother and Father, an adjudication order was issued and all three children were found to be dependent. J. was placed in the physical custody of her biological father, M. to the custody of her maternal grandparents and B. J. to her foster parents.

Father appealed the March 20, 2013 orders concerning M. and B. J. to the Pennsylvania Superior Court on April 17, 2013. Mother appealed the Orders concerning all three girls to the Superior Court on the same day. The Superior Court issued its opinion on December 10, 2013, affirming the dependency adjudication decision, but finding there were no aggravated circumstances and remanding the matter because of

5

the Court's decision to deny a reunification plan based thereon. A remand hearing was scheduled for March 3, 2014, and then continued to June 23, 2014, at the same time as a permanency review hearing. It was around this time when Mother went on her own to see another therapist, Bruce Eyer. (N.T. 1/7/13) 137) He has recommended no further necessary action, but this decision was based only on what Mother chose to self-report. For instance, he did not even know about the first instance of abuse. (*Id.*, 151) She remains in therapy with him; he still has no detailed background information and has not dealt with any abuse. (N.T. 4/28/14, 7-8; 6/23/14, 21) Mother and Father are involved in a parenting program; a caseworker inquiry found that it involved basic child care and did not deal with abuse. (N.T. 4/28/14, 14.) Mother testified that she cannot think of any other services that the Agency could provide to her to remedy her situation. (N.T. 6/23/14, 26) Father did not testify at all so the status of his involvement in any services is unknown. The only information the Court has is that he has been attending a parenting program with Mother.

This Court issued its dispositional order on July 1, 2014, and, without finding aggravated circumstances, denied the parents a reunification plan. On July 30, 2014, Mother and Father both appealed the July 1 order to the Pennsylvania Superior Court, which issued an opinion on February 19, 2015, again remanding the matter to the trial Court with instructions to discuss the specific considerations set out in Section 6351(f) and Section 6351(f.1) of the Pennsylvania Juvenile Act. It is pursuant to this remand that this opinion is being written. The arguments and discussions of this Court's two prior decisions, insofar as consistent with the two Superior Court remand opinions, are incorporated herein by reference.

6

## ISSUE

Whether two young children should be returned to their family in which their older half-sister was seriously abused on two separate occasions, the parents have been found to be perpetrators of the abuse, have no plan for reunification, have made no progress toward remedying the situation in which the abuse occurred, and where the children live with appropriate permanent resource families.

## ANALYSIS

Section 6351(f) sets out specific elements for the trial court to consider during a review hearing in order to support its decision after that hearing. These elements and the Court's specific consideration of them are as follows:

Section 6351(f) Matters to be determined at permanency hearing – At each permanency hearing, a court shall determine all of the following:

(1) the continuing necessity for and appropriateness of the placement.

Given the history of this family, the serious abuse perpetrated twice upon J. and the fact that there have been no serious remedial actions taken by the family relative to infliction of abuse, the children remain appropriately in foster care. The Court cannot rely upon either Mother or Father to keep the children safe since both, at different times, inflicted serious physical abuse upon J. This is not a situation where one parent is appropriate. Neither parent can be trusted to ensure the safety of the children. And since M. is doing well in a household which includes her maternal grandparents and her half-sister J., B. J. is doing well and is happy in her current resource home, and the girls visit with each other on a regular basis, the Court finds these arrangements to be decidedly appropriate. If the children are not in placement in a safe setting with

7

appropriate resource parents, then the only alternative is to return them to two parents who are proven abusers of a child.

(2) the appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

While there is currently no plan for reunification in effect, the parents' compliance therewith cannot be examined, but these parents have been in a prior situation where they were operating under a safety plan and a Family Service Plan for J. The plan included various goals for the parents and also provided for a personal parent trainer (PPT). Despite the provision of one-on-one instruction by the PPT and in the final phase of their Family Service Plan, J. was again seriously abused, indicating that these parents were not sufficiently compliant with the plan to remedy their abusive tendencies.

(3) the extent of progress made toward alleviating the circumstances which necessitated the original placement.

There is no visible progress. J. was abused for the second time during the time a PPT was providing extensive help to the parents and they were also receiving help from the Agency. Mother continues to insist that the child was not abused, but harmed herself. She also does not believe that Father was the perpetrator of the first abuse which included two fractured bones. By the time of placement in 2012 when J. was just four and a half years of age, she had been seriously abused by both her step-father and then by her mother. The Court saw a disturbing lack of candor in these parents' testimony. It was clear from Dr. Hoshauer's testimony that J. was not injured by her activities during "night terrors." She was harmed by someone else. Mother has also not been truthful with her current therapist and without the operative facts he has concluded

8

that she needs no additional help from him. Whether the parents' denial is purposeful or unconscious, it does not bode well for the safety of young children in their care and certainly indicates that these parents have made little if any progress.

Since the second placement of J., the parents attended a "basic child care" class which did not deal specifically with abuse. If the parents were unable to make progress with the intensive one-on-one PPT class, then attending a basic class on child care is of little value to alleviate the reason which necessitated the reason for placement.

(4) the appropriateness and feasibility of the current placement goal for the child[ren].

The children are in suitable resource homes where they are doing well, are happy, and, above all, are safe from the kind of abuse perpetrated upon J. by her step-father and her mother. Both homes are permanent resources and adoption is contemplated as soon as is procedurally possible.

Section 6351(f.1) sets out additional matters for examination. The relevant paragraph in this case is (f.1)(2) which asks the Court to consider "if and when the child will be placed for adoption and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child."

As stated above, the Court believes because of the two separate physical abuses perpetrated upon J., the lack of candor of the parents about the origin of her injuries, their lack of response to the remedial efforts taken by the Agency, and their current lack of realistic remedial services, there is no way the Court can return these children to their parents and thereby put their safety, protection, physical, mental and moral welfare in

jeopardy. The current, very appropriate placements are permanent, and adoption of these children is contemplated.

For the reasons set out above, the Court finds that the current disposition is that which is best suited to the safety, protection, and physical, mental and moral welfare of the S. children.

BY THE COURT:

*Lllee Gorbey*

Dated: March 16, 2015

LESLIE GORBEY, JUDGE

Attest:

Copies to:
    Caprice Hicks-Bunting, Esquire
    Samuel Encarnacion, Esquire
    Elizabeth A. Stineman, Esquire
    David J. Natan, Esquire

I certify this document to be filed in the Lancaster County Office of the Clerk of the Courts.

Joshua G. [illegible]
Clerk of the Courts

10

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
JUVENILE DIVISION

IN THE INTEREST OF:                    :    SUPER. CT. NO.: 1288 MDA 2014
                                       :
M. S., A Minor                         :    DOCKET NO.: CP-36-DP-95-2012
B. J. S., A Minor                      :    DOCKET NO.: CP-36-DP-196-2012

---

IN THE INTEREST OF:                    :    SUPER. CT. NO. 1289 of 2014
                                       :
M. S., A Minor                         :    DOCKET NO.: CP-36-DP-95-2012
B. J. S., A Minor                      :    DOCKET NO.: CP-36-DP-196-2012

By: Leslie Gorbey, J.

## OPINION SUR APPEAL

FACTUAL HISTORY AND PROCEDURAL HISTORY

Three sisters are involved in this case: J. R. (J.), born September 15, 2007, M. S.

(M.), born November 22, 2010, and B. J. S. (B. J.), born November 11, 2012. J. S.

(Mother) is the mother of all three girls. R. S. (Father) is the father of M. and B. J., and

S. R. is J.'s father.[1]

At the time of J.'s birth, Mother was single. She subsequently married R. S.

When J. was nine months old, she was reported as abused to the Lancaster County

Children and Youth Social Service Agency (Agency). Her injuries, as described in a

Commonwealth Court opinion, included bruising and swelling of the left side of her

head, bruising near the right temporal region, bruises on both sides of her neck, a large

bruise on the rib cage, a buckle fracture of the left tibia and a fracture of the left 8th rib.

*R.S., Jr. v. Department of Public Welfare,* No. 1947 C.D. 2010 (April 1, 2011).

---

[1] S. R. did not file an appeal.

1

Protective Service Plan was put in place. (N.T. 9/17/12, 48) Father was indicated as the perpetrator of this abuse on August 1, 2008, and J. was placed informally by agreement, with her maternal grandparents. On June 18, 2010 the protective services case was closed. Mother has never believed that Father was a perpetrator. Father appealed to the Commonwealth Court, which affirmed his status as perpetrator. (Id)

Mother gave birth to M. S. on November 22, 2010. Although the infant was permitted to go home with Mother and Father, a safety plan was established by the Agency providing that Father was to have no unsupervised contact with her. (N.T. 1/7/13, 95) The Family Service Plan also provided that both parents be evaluated for parental competence. After J.'s first abuse, Mother had seen a therapist, John Weigel, as part of her plan. He found Mother functioning at a borderline intelligence range and had serious concerns about her ability to function as a parent. He recommended individual counseling to address the relevant issues. He was also concerned about her failure to accept Father as the perpetrator. His test results show that Mother had a high score on the scale indicating false answers.

Mother next saw Dr. Gransee, an Agency consultant, in May of 2011; his evaluative report recommended parent training. Mother also went on her own to see another therapist, Bruce Eyer. (N.T. 1/7/13) 137) He has recommended no further necessary action, but this decision was based only on what Mother chose to self-report. For instance, he did not even know about the first instance of abuse. (Id., 151) She remains in therapy with him; he still has no detailed background information and has not dealt with the abuse. (N.T. 4/28/14, 7-8; 6/23/14, 21) Mother and Father are involved in a parenting program; a caseworker inquiry found that it involved basic child

2

care and did not deal with abuse. ( N.T. 4/28/14, 14.) Mother testified that she cannot think of any other services that the Agency could provide to her to remedy her situation. (N.T. 6/23/14, 26) Father did not testify as to the status of his compliance, if any, with the plan. The only information the Court has is that he has been attending a parenting program with Mother.

On August 20, 2011, a Personal Parent Trainer (PPT) was assigned to the Ss'. After some time, the parents seemed to be making progress, and J. returned to live with her mother, step-father and sister in January of 2012. The PPT, who was to stay to support the reunification, was discontinued early when J. was again abused in March of 2012. On March 16, 2012, Mother took J. to see a physician and told him that bruises on the child happened during a nightmare when J. threw herself against a wall. (N.T. 9/17/12, 77) After a second incident on March 20, 2012, the Agency received a March 23rd call from Mother to tell them that J. had banged into the bedside wall during a nightmare and had been injured. When the caseworker went out to the house to investigate, she found that the child had black eyes, bruising and lacerations to her face. She took photographs. (GAL's Exhibit 1). Mother reported that she had gone into J.'s room alone after hearing J. scream, and believed that J., in the throes of a nightmare, had slapped or punched herself in the face, or banged her head, face first, against the wall. (N.T. 1/7/13, 114 *et seq.*, 131) Mother did not see these things happen; it was a supposition or fabrication on her part. Father did tell his mother-in-law that Mother was hitting J.. (N.T. 7/30/212, 287) Mother told the police that the medication she was on could have caused the incident, but she later denied having said that. (N.T. 7/30/12, 166). Mother insisted that J. had frequent nightmares or "night

3

terrors." She told an Agency caseworker that "J.'s nightmares were getting worse. . . And they were going to be taking J. to the doctor because B. was concerned that J. may be having some kind of seizures because she shakes so violently during the nightmares." (N.T. 7/30/12, 354) The resource mother told the court that J. had had no nightmares or other nighttime disturbances while with her. (N.T. 7/30/12, 197-198) In addition, when M. S., the child's aunt, brought J. to see Dr. Hoshauer for an investigation of abuse, she said nothing about J. having sleep problems, although she was specifically asked. (*Id* at 230) Mother also went out of her way to hide the injured child from others. During the week following the injury, she did not take J. to the doctor for treatment for the injuries, canceled her meetings with the PPT, and kept J. home from school. (N.T. 1/7/13, 144) She did not keep an appointment for an investigative meeting with the police. (N.T. 7/30/12, 167-169)) She told the Court that the doctor had been unavailable when she called, but she admitted she did not seek alternative care such as an Emergency Room visit. (*Id* at 144-147) J.'s Shelter Care Order triggered by the March 23, 2012 abuse was issued by the Lancaster County Court on May 1, 2012. On May 10, 2012, temporary custody of M. was also given to the Agency, Mother was named as a perpetrator of abuse against J. and both children were placed by the Agency. Father was named as a perpetrator by omission because he appeared to know that Mother had been hitting J.. (N.T. 7/30/12, 287) On May 14, 2012, a scheduled hearing was continued because Father's attorney was unavailable. On May 18, 2012, M. was placed in an Agency approved resource home with J.. A safety plan provided that J. and M. would live with their paternal aunt M. S. and have only supervised contact with Mother and Father. A CASA was appointed for the case on

4

May 22, 2012. Unfortunately, the aunt's significant other did not want to be a permanent resource for the child, so on June 18, 2012, after a hearing, the order was modified and the children were placed in foster care.

On July 30, 2012, and September 17, 2012, hearings were continued because of a lack of time to complete testimony. On September 20, 2012, the girls' placement was modified after hearing, and they were moved to live with their maternal grandparents. Mother could visit only in her parents' house. Hearings were held on October 1 and 14, December 6, 2012, and January 7, 2013 in order to complete testimony.

Mother informed the Agency on October 11, 2012 that she was again pregnant and her third child was born on November 11, 2012. The Agency took custody of the newborn, B. J., and placed her in an agency approved resource home. These foster parents are willing to be a permanent resource for the little girl.

The Court received expert testimony from Cathy Hoshauer, M.D., a pediatrician and an expert in the evaluation of abuse victims. (N.T. 7/30/12, 203 *et seq.*) Dr. Hoshauer had seen J. and reviewed an interview of her by a forensic interviewer concerning the injuries. She subsequently prepared a report, in which she concluded that the injuries sustained by J. were inconsistent with her hitting her head on a wall. (*Id.* at 215 *et seq*; Petitioner's Exhibit 1) She explained further that "if you bump your head against a wall, you're not going to get injuries in multiple different places. So her injuries were her mouth, below her eye, above her eye and hemorrhage within the eye, and that's not something that will - - that a child can create enough force on their own." (N.T. 7/30/12, 223-224) She also responded negatively when asked if she had ever

5

seen a child of four or so who was able to self-injure themselves with their own hands or other body parts to cause purple bruising on their face. (N.T. 7/30/12, 219)

On March 20, 2013, aggravated circumstances were found as to Mother and Father, an adjudication order was issued and all three children were found to be dependent. J. was placed in the physical custody of her father, M. to the custody of her maternal grandparents and B. J. to her foster parents.

Father appealed the March 20, 2013 orders concerning M. and B. J. to the Pennsylvania Superior Court on April 17, 2013. Mother appealed the Orders concerning all three girls to the Superior Court on the same day. The Superior Court issued its opinion on December 10, 2013, , affirming the dependency adjudication decision, but finding there were no aggravated circumstances and remanding the matter because of the Court's decision to deny a reunification plan based thereon. A remand hearing was scheduled for March 3, 2014 and then continued to June 23, 2014 at the same time as a permanency review hearing. This Court issued its dispositional order on July 1, 2014, and without finding aggravated circumstances denied the parents a reunification plan. On July 30, 2014, Mother and Father both appealed the July 1 order to the Pennsylvania Superior Court, pursuant to which appeal this opinion is being written.

## ISSUE

Whether the Court appropriately denied Mother and Father a reunification plan for their two younger daughters when the third daughter had been physically abused twice at separate times, once by Father resulting in bruising and two fractures and twice by Mother resulting in serious bruising of her head and face, neither party has completed a

6

plan in a period of over three years, and there are no additional useful services that can be offered to Mother and Father.

## ANALYSIS

In its opinion of December 10, 2013, the Superior Court affirmed this Court's decision that M. and B. J. were dependent and abused children. The Superior Court, however, found that this Court erred in its finding of aggravated circumstances; the case was remanded for an examination of whether a plan for reunification could be withheld absent aggravated circumstances. This court scheduled and held hearings relevant to the Superior Court's remand order.

Once a child has been adjudicated dependent, additional decisions in the context of permanency planning are made according to his best interest. *In re J.S.W.*, 651 A. 2d 167 (Pa. Super 1994) Permanency planning is a concept whereby children are not relegated to the limbo of spending their childhood in foster homes, but instead, dedicated effort is made by the court and the children's agency to rehabilitate and unite the family in a reasonable time, and failing in this, to free the child for adoption. In re J.S.W., 651 A.2d 167, 170 (1994 ) The Superior Court has held that providing no plan for reunification can be an appropriate decision, depending on the factual circumstances. *In re R.T., C.A., K.A.,* 778 A.2d 670 (Pa. Super, 2001) In *In R.T.*, although the trial court had found that aggravated circumstances existed and did not provide a reunification plan based on that finding, the Superior Court decided that there were no aggravated circumstances because of a lack of statutory retroactivity, but still permitted there to be no plans for reunification. In so doing, the Court said :

7

Preliminarily, we note that although the polestar of the Juvenile Act is reunification of the family, 55 Pa. Code § 3130.67 lists adoption as a permissible goal for a dependent child. *See id.* at (b)(9)(iii). *See also In the Matter of Luis R.,* 430 Pa. Super. 518, 635 A.2d 170, 172–73 (1993), *appeal denied,* 538 Pa. 635, 647 A.2d 511 (1994) (noting permissible goals listed in 55 Pa. Code § 3130.67(b)(9), and explaining that "one goal is not mandated over another; nor does the language of the regulation require that each goal be implemented in the order in which they are listed."). A review of the trial court's .........Order and its Opinion following appeal reveals that the court found the placement plan amendments at issue here appropriate, regardless of the alleged aggravating circumstance." In re R.T., 2001 PA Super 157, 778 A.2d 670, 680 (Pa. Super. Ct. 2001)

The instant opinion is directly governed by the *In re R.T.* holding, and this court finds that refusal of a reunification plan for Mother and Father is an appropriate measure. In 2008, at nine months of age, J. was physically abused by Father, with resulting serious physical injuries. Mother continues to believe that Father was not the perpetrator. Then in 2012, **after** a Personal Parent Trainer worked with Mother and Father, **after** both J. and M. were returned to them, **after** they had been involved with the Agency for a matter of years and received a long list of services, J. was again seriously abused, experiencing resulting lacerations, bruising, swelling on the face and swollen and black eyes. The family was unable to look inward for a cause, instead blaming the child herself, citing bad dreams and sleep disorders. This conclusion was dispelled by the testimony of Dr. Horshauer, a pediatrician, who said she had never seen a child harm herself as J.'s injuries indicated. The Court agrees with and accepts Dr. Horshauer's opinion as a matter of judicial good sense, finding Mother's testimony not credible. The limited strength and small hands of a child cannot conceivably create on that child's own body the kind of injuries obvious on J.'s face in the picture provided as the Guardian's Exhibit 1, and bumping a head against a wall cannot conceivably produce various discrete injuries all over a child's face. The Court believes that J. did

8

not harm herself, but rather that Mother was the perpetrator. Mother's actions on the night of the injuries and afterward are very telling to this Court and support its decision. She was in J.'s room before anyone else for some unspecified period of time. She insisted unreasonably that J. was responsible for her own injuries. She contends that she did not obtain medical care for J. because when she called to make an appointment, the doctor would not see J., but then she never took this visibly injured child to the emergency room for treatment. She kept the child home from school so the teachers, mandated reporters, would not see her. She insistently refused to permit the personal parent trainer to come as she normally would, so the PPT would not see J. That Mother harmed J. and then went to such lengths to keep her hidden and away from medical attention indeed provides sufficient evidence that J. is an abused and dependent child. The extent of her injuries and her mother's indifference to them as well as the history of her step-father's abuse, clearly supports her having been removed from her parents' custody.

Although J. was seriously abused twice, once by her step-father and once by her mother, a scenario which fulfills the requirements of abuse and dependency, the court recognizes that M. and B. J. were not physically harmed by either Mother or Father. Nonetheless, the operative concepts apply to them also. They have a Mother and Father who are both perpetrators of abuse as parents. There is nothing in the record that indicates to the court these children would be safe if they were given into the custody of these parents, absent Mother's and Father's successfully engagement in remedial activities. Mother and Father did not sufficiently engage in such activities. Neither was fully compliant with the available plan. Mother saw a counselor at

9

Pennsylvania Counseling Services, but stopped when the counselor went elsewhere. She saw Dr. Gransee, who recommended parent training, which the Agency provided in the form of a PPT. Despite such personalized training, J. was injured again. Mother went to Dr. Eyer, another therapist, on her own initiative, but never showed him prior informational reports, allowing him to know only what she chose to self-report. Father never even testified as to his remedial activities, if any. Mother told the Court that she and Father are now in counseling together, but little information is available concerning the substance of the counseling or their progress. There are no objective criteria available to the court that indicate that Mother's and Father's predilections to harm a child in their care has been remedied to such an extent that J., or any other child, would be safe. In the last hearing, Mother was candid in admitting that there was nothing else the Agency could provide that would be helpful to her.

To allow these children to languish in foster care, while no additional services are available, is clearly not in the children's best interests. Not only are M. and B. J. unquestionably dependent children at the present time, they appear to be permanently without an appropriate parent. After a finding of dependency, the standard to be applied by the court as to further disposition is the best interest of the child . M.'s and B. J.'s best interests requires that they live permanently in a loving home where there exists no risk of harm from their parental caretakers. Given the long time frame of this case and the parents' lack of progress, Mother and Father are not those caretakers and cannot be trusted to provide a safe haven for these children within a reasonable period of time.

10

## CONCLUSION

For the reasons stated above this Court finds that to return M. and B.J. to Father and/or Mother would place the children at risk of harm, since neither parent has completed a plan or reached a status which informs the court that there is no longer a risk of abuse being perpetrated upon a child in their custody. The Court therefore believes it to be in these dependent children's best interest to deny Mother and Father a reunification plan.

BY THE COURT:

DATED: August 22 , 2014                LESLIE GORBEY, JUDGE

Attest:

Copies to:

    Caprice Hicks-Bunting, Esquire
    Samuel Encarnacion, Esquire
    Elizabeth A. Stineman, Esquire
    David J. Natan, Esquire

I certify this document to be filed in the Lancaster County Office of the Clerk of the Courts.

Joshua G. Parsons
Clerk of the Courts

11