J-A24021-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: DEPARTMENT OF HUMAN SERVICES (DHS) | No. 544 EDA 2015 |

Appeal from the Order Entered February 25, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at Nos.: CP-51-DP-0002233-2014
FID#51-FN-002054-2014

| | |
|---|---|
| IN THE INTEREST OF: A.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M. | |
| Appellant | No. 941 EDA 2015 |

Appeal from the Order Entered February 25, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No.: CP-51-DP-0002233-2014

BEFORE: PANELLA, J., WECHT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED SEPTEMBER 15, 2015**

The Philadelphia Department of Human Services ("DHS") and A.M. ("Child") (d.o.b. May 2012), through her guardian *ad litem* ("GAL"), appeal the February 25, 2015 order. That order dismissed DHS' dependency petition and returned Child to M.Y. ("Mother"). We affirm.

---

[*]    Retired Senior Judge assigned to the Superior Court.

On September 23, 2014, DHS filed a petition to have Child found to be a dependent child. On February 25, 2015, the trial court held an adjudicatory hearing on the dependency petition. The trial court provided the following summary of the evidence developed at the hearing:

> [T]he assistant city solicitor, representing DHS, presented testimony from Sierra Rambert, a DHS intake worker. [The trial court] found Ms. Rambert to be a credible witness. Ms. Rambert testified that the Child's case first became known to DHS following a report, in September 2014, alleging that [Aa.M. ("Father")] was hitting Child for "pooping in her pamper." On September 17, 2014, Ms. Rambert met with Father at a rooming house located [on] Webster Street to discuss these allegations. Father admitted to [spanking] Child on her bottom, as this was his method of potty training, but denied Ms. Rambert access into the home.
>
> Ms. Rambert testified that she instructed Mother to take her Child to the hospital to determine the origin of certain marks on the Child's body. On Saturday, September 18, 2014, Ms. Rambert met with Mother and Child at Children's Hospital at which time Mother signed all necessary paperwork to have her Child examined and treated. After the Child was examined, an Order of Protective Custody was obtained based upon information from the hospital and the Child was placed in the care of DHS. Ms. Rambert spoke with Mother about her method in potty training her Child. Mother stated that she never hit her Child.
>
> Ms. Rambert testified that, while at the hospital, she viewed photographs of the Child which depicted a bruise under the Child's right eye, a scratch on her arm and scratches and bruises on her buttocks. Mother believed that the scratches came from the family cat. She told Ms. Rambert that the Child often plays with the cat and that she had observed the cat scratch her Child. Mother acknowledged that she had to leave the Child in the care of Father when she had to work a double shift. As part of her investigation, Ms. Rambert conducted interviews with three other children under Mother's care. None of these children indicated that Mother used physical discipline on them or upon the Child. Based upon her investigation, Ms. Rambert believed that Father

inflicted all of the injuries sustained by the Child. However, it is important to note that Ms. Rambert conceded that[,] despite viewing the photographs of the Child's injuries, she was unable to conclude how the marks on the Child were caused without speaking to a doctor.

At the adjudicatory hearing, the assistant city solicitor presented expert testimony from the Child's treating physician, Dr. Samantha Schilling. [The trial court] found Dr. Schilling to be a credible witness. Dr. Schilling, a general pediatrician and also a child abuse pediatrician from the Children's Hospital of Philadelphia, testified extensively regarding her qualifications. . . . Based upon the testimony of her extensive training . . . [the trial court] qualified Dr. Schilling as an expert in child abuse pediatrics.

Dr. Schilling testified that she treated the Child at Children's Hospital on September 18, 2014. Dr. Schilling recounted that the Child had some facial bruising and multiple lacerations at different stages of healing on her buttocks. Based upon her vast expertise, Dr. Schilling testified, within a reasonable degree of medical certainty, that the Child's injuries were sustained at different times. Dr. Schilling noted that the injuries to the Child's buttocks were not in a location where accidental injuries would be expected to be found. Dr. Schilling also described that her examination of the Child revealed patterned injuries which suggested that they were caused by some sort of object. Dr. Schilling noticed patterned bruising on both of the Child's arms which led her to conclude, to a reasonable degree of medical certainty, that the Child had inflicted injuries.

Dr. Schilling also offered evidence from the medical records from Children's Hospital which indicated that the Child was cared for by Mother and maternal grandmother. The records reflected that Mother had first noticed the marks on the Child's arms on Wednesday, September 17, 2014. A few weeks earlier, maternal grandmother had pointed out to Mother the marks on the Child's bottom. The records from Children's Hospital indicated that Mother suspected that these injuries were caused by the family cat. Dr. Schilling's expert opinion was that the Child's injuries were not caused by a cat. The hospital record also reflected that Mother believed that the bruising on the Child's face was the result of Child falling asleep on a futon during which time the Child's face was pressed upon a bar on the futon. Dr. Schilling testified that, although unlikely, it was not impossible for this to

- 3 -

occur. Finally, the hospital records indicated that the Child had recently been left in the care of her Father for 12-16 hours on September 13, 2014. At the time of the adjudicatory hearing, Father had been arrested[, and] was being held on charges related to allegations of child abuse against [] Child. [The trial court] accepted the expert opinion of Dr. Schilling that the Child had sustained non-accidental inflicted injuries.

Regarding Mother, Dr. Schilling testified that[,] when she first saw Child and Mother, she noticed that she had a good rapport with her Child and appeared to be a loving Mother. Dr. Schilling noticed that the Child did not show any fear or reluctance to go with Mother. Finally, Dr. Schilling referred to the records from Children's Hospital[,] which indicated that[,] at the time of the Child's follow up visit, all of the injuries that Dr. Schilling had previously identified as inflicted injuries were healing.

The key testimony at the adjudicatory hearing was elicited from Ms. Doris[1] Cassell. [The trial court] found Ms. Cassell to be a credible witness. Ms. Cassell testified that she used to reside in a rooming house at [] Webster Street, where Father used to live. She recalled Father staying there at times. She also remembered seeing Father with Child at this home on a few occasions. Ms. Cassell became concerned for the Child's welfare after hearing instances that led her to believe that Father was verbally and [physically] abusing [Child]. Specifically, Ms. Cassell heard Father yelling and hitting the Child accompanied by sounds of the Child crying. Ms. Cassell testified that[,] if the Child didn't say certain words, Father would threaten and hit her. Ms. Cassell would hear loud whipping sounds and Father's voice yelling crazy things. Ms. Cassell recounted that there were three times that she heard things that concerned her, two of these instances occurred in September 2014. The first time that Ms. Cassell heard noises that concerned her, she came out of her room and encountered Father at which time she asked to meet his daughter. Ms. Cassell spoke briefly with the Child, asking her what her name was. When the Child didn't respond, Father started jumping at his Child. Ms. Cassell tried to diffuse the

_____

1    Ms. Cassell's first name is listed as "Dorkis" in other parts of the record and Mother's brief and "Dorcas" in the GAL's and DHS' briefs. It is unclear which is correct.

situation by saying it was okay and leaving the room. Ms. Cassell testified that it was her intention to make a call about Father, but was scared to do so. Ms. Cassell described the Child's demeanor as being quiet and scared. Ms. Cassell also stated that she observed a cut on the Child's face.

Ms. Cassell remembered that, after that first encounter, Father had been telling the Child to say a certain word and she wouldn't respond. Father reacted by hitting the Child[,] who would then cry. This prompted Father to call Mother to ask why the Child wouldn't speak and inquire as to what was wrong with her. Ms. Cassell was able to hear the conversation[,] which was on speakerphone. Ms. Cassell described Mother as sounding really sweet and motherly, attempting to ask the Child what was wrong. The moment Mother hung up, Father's demeanor changed drastically. He resumed yelling, threatening and hitting the Child, causing her to cry.

Ms. Cassell testified that she recalled seeing the Child at the rooming house on two other occasions. On one such occasion, Mother was present. According to Ms. Cassell, when Mother was around[,] things were different. Ms. Cassell felt comfortable when Mother was present because she didn't hear any concerning sounds coming from Father's room. When interviewed by the Special Victims Unit of the Philadelphia Police department, Ms. Cassell described Father as sort of a Jekyll and Hyde. Ms. Cassell explained that Father would act differently when Mother was present or could hear him.

Finally, [the trial court] heard testimony from DHS worker, Nia Hardgrove. [The trial court] found Ms. Hardgrove to be a credible witness. Ms. Hardgrove testified that she was assigned to Child's case in November 2014 at which time she reviewed the entire case file. Ms. Hardgrove testified that she had supervised three visits between Mother and Child[,] all of which she reported to be appropriate. Additionally, Ms. Hardgrove testified that Mother's home was appropriate. During these visits, Ms. Hardgrove did not observe anything that would prevent the Child from being reunified with Mother. Ms. Hardgrove also made [the trial court] aware that there were three other children living in Mother's home, none of whom were [*sic*] subject to any action by DHS.

Trial Court Opinion ("T.C.O."), 4/8/2015, at 2-8 (citations to record omitted).

During the hearing, the trial court determined that DHS had not met its burden of proving that Mother committed child abuse by omission because DHS had not established that Mother was aware of the abuse by Father. Because Mother was able to care for Child, the trial court found that Child was not dependent, dismissed DHS' petition, and ordered Child to be returned to Mother.

On February 26, 2015, DHS filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On March 23, 2015, the GAL filed a notice of appeal and a concise statement of errors complained of on appeal.[2] On April 8, 2015, the trial court issued a Pa.R.A.P. 1925(a) opinion.

DHS raises four issues on appeal:

1. Whether the trial court erred as a matter of law and abused its discretion where it determined that [Mother] was not a perpetrator of child abuse against [Child]?

2. Whether the trial court erred as a matter of law and abused its discretion when it ordered that the Child was to be reunified with her Mother?

3. Whether the trial court erred as a matter of law and abused its discretion when it determined that the Child did not meet the definition of a dependent child?

---

[2] On April 15, 2105, we entered an order consolidating the appeals.

4. Whether the trial court erred as a matter of law and abused its discretion when it dismissed the Child's dependency petition filed by DHS?

DHS' Brief at 6.

The GAL raises three issues for our review:

1. Did the trial court err as a matter of law and abuse its discretion by finding that Mother was not a perpetrator of abuse of [Child] under the criteria set forth in 23 Pa.C.S.A. § 6303(b.1)(1) and (5), when uncontradicted evidence of record, including expert and fact testimony and documentary evidence, established that Mother's recent failures to act caused bodily injury or a reasonable likelihood of bodily injury to [Child] when Mother placed [Child] in the care and custody of her Father, where [Child] suffered serious and obvious physical abuse; that Mother thereafter failed to take any action to address the abuse or prevent its recurrence; and that, even after [Child] was evaluated and treated by medical professionals and clear evidence of abuse was identified, Mother continued to deny that any abuse occurred?

2. Did the trial court err as a matter of law and abuse its discretion by ordering that [Child] be returned to Mother, and by dismissing the dependency petition filed by [DHS], despite uncontradicted evidence of record, including expert and fact testimony and documentary evidence establishing the facts stated above, that showed that removal was necessary to prevent further injury to [Child]?

3. Did the trial court err as a matter of law and abuse its discretion by finding that [Child] was not a dependent child, as defined by 42 Pa.C.S.A. § 6302, and by dismissing the dependency petition filed by [DHS], despite uncontradicted evidence establishing the facts stated above, that showed [Child] was without proper parental care or control as required by law or other care or control necessary for her physical, mental or emotional health?

GAL's Brief at 4-5.

Because the GAL's and DHS' issues on appeal are similar, we address them together. Our standard of review for a dependency adjudication is well-settled:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re E.B.*, 83 A.3d 426, 430 (Pa. Super. 2013). Further, in our review, "[i]f the trial court's findings are supported by competent evidence, we must affirm the court's decision, even though the record could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 822 (Pa. 2012).

A dependent child is one who:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk

42 Pa.C.S.A. § 6302. "A court is empowered . . . to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence." *In re M.L.*, 757 A.2d 849, 850 (Pa. 2000). Further:

> A finding of abuse may support an adjudication of dependency. When the court's adjudication of dependency is premised upon physical abuse, its finding of abuse must be supported by clear

and convincing evidence. However, its findings as to the identity of the abusers need only be established by *prima facie* evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers (parents).

***Matter of C.R.S.***, 696 A.2d 840, 843 (Pa. Super. 1997) (citations and quotation marks omitted).

In its petition, DHS alleged that Child was an abused child. However, between the time that DHS filed its petition and when the trial court held the adjudicatory hearing, the statutory definition of an abused child was amended. The GAL argues that the newer version of the statute should apply to the circumstances of this case. GAL's Brief at 22. Mother contends that the older version must apply. Mother's Brief at 10.

We addressed a similar issue of the retroactive effect of an amendment to the Juvenile Act in ***In re: R.T.***, 778 A.2d 670 (Pa. Super. 2001). In that case, the Act was amended with regard to aggravated circumstances between the filing of the dependency petition and the adjudication. The agency filed an amended petition seeking such a finding and the trial court found that aggravated circumstances existed. ***Id.*** at 676. The parents raised the issue of the retroactive application in their appeal. Regarding which version of the Act to apply, we stated:

> There is a clear mandate by the legislature against retroactive application of a statute. ***See*** 1 Pa.C.S.A. § 1926 ("No statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly."). However, "[w]hile there is a presumption against retroactive application of statutes affecting substantive rights, a law is only retroactive in its application when it relates back and gives a previous transaction a legal effect different from that which it had under the law in

effect when it transpired." **McMahon v. McMahon**, 612 A.2d 1360, 1364 (Pa. Super. 1992).

> Where . . . no vested right or contractual obligation is involved, an act is not retroactively construed when applied to a condition existing on its effective date even though the condition results from events prior to that date . . . '[A] statute is not regarded as operating retroactively because of the mere fact that it relates to antecedent events, or draws upon antecedent facts for its operation.'
>
> **Creighan v. City of Pittsburgh**, 132 A.2d 867, 871 (Pa. 1957) (quoting 50 Am.Jur. Statutes, § 476). A "vested right" is one that "so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." Black's Law Dictionary 1324 (7th ed. 1999).
>
> Clearly, Appellants' right to parent their children is a vested right. If we were to consider the involuntary termination of Appellants' rights to Brittany an aggravating circumstance, and thus permit the court to conclude that the Agency need not make reasonable efforts to return the [other] children home, it would effectively give "a previous transaction [*i.e.,* the termination of Appellants' parental rights to Brittany,] a legal effect different from that which it had under the law in effect when it transpired." **McMahon**, *supra* at 1364. Prior to the enactment of the 1998 amendments, the involuntary termination of parental rights to one child had no direct application in a dependency proceeding for another. Therefore, we find that the trial court erred in considering the termination of Appellants' parental rights to Brittany an aggravating circumstance in the present case.

**In re R.T.**, 778 A.2d 670, 679-80 (Pa. Super. 2001) (citations modified; footnotes omitted).

Here, there is nothing in the new legislation to indicate that the General Assembly intended it to have retroactive effect. **See** 2013 Pa. Legis. Serv. Act 2013-108 (H.B. 726). As in **R.T.**, the present situation clearly involves a vested right to parent one's child. The question, then, is

whether the change in definition would give a different legal effect to a prior transaction. The definition of abuse changed from requiring "serious physical injury," 23 Pa.C.S.A. § 6303(b)(1), to requiring only "bodily injury," 23 Pa.C.S.A. § 6303(b.1.)(1). Serious bodily injury was defined as "[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of function of any bodily member or organ." 23 Pa.C.S.A.§ 6303(a). Bodily injury is defined as "[i]mpairment of physical condition or substantial pain." *Id.* Because the threshold for an injury to constitute abuse substantially changed, the amendment would give a different legal effect to actions that, pursuant to the prior version, would not constitute abuse. Therefore, we must conclude that the prior version should be applied to this case.[3]

DHS' petition charged that Mother committed abuse pursuant to 23 Pa.C.S.A. § 6303(b)(1), which stated, in pertinent part:

(1) The term 'child abuse' shall mean any of the following:

    (i)        Any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age.

                                \*   \*   \*

    (iii)      Any recent act, failure to act or series of such acts or failures to act by a perpetrator which create an imminent risk of serious physical injury to or

---

[3]    ***See also In re L.Z.***, 111 A.3d 1164, 1173 n.8 (Pa. 2015) (applying prior definition of child abuse after change to statute, but not addressing retroactivity).

> sexual abuse or sexual exploitation of a child under 18 years of age.

23 Pa. C.S.A. § 6303(b)(1).  In the context of child abuse, we must also consider the following:

> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(a).

DHS argues that the record does not support the trial court's conclusion that Mother was not a perpetrator of abuse by omission. Essentially, DHS asserts that the excuses that Mother offered to explain Child's injuries, namely the family cat and the futon, were unreasonable given the type of injuries sustained by Child.  Additionally, DHS argues that the injuries were visible and were inflicted at different times, as confirmed by Dr. Schilling's testimony.  Because Mother acknowledged observing the injuries and because Mother could not have reasonably believed the injuries were caused by anything other than abuse, DHS concludes Mother knew or should have known that Father was physically abusing Child.  DHS' Brief at 25-28.

The GAL makes similar arguments as DHS, but also asserts that, because Mother did not testify,[4] the trial court could not assess Mother's credibility regarding her explanations for Child's injuries. The GAL also asserts that it does not matter if Mother was present when Father abused Child, because Mother was responsible, nonetheless, if she observed Child's injuries and did not take steps to protect Child from further abuse. GAL's Brief at 26-31.

The trial court found that the evidence did not support a finding that Child was at risk for serious bodily injury because there was no evidence that Child endured substantial pain. T.C.O. at 11-12. The trial court cited Child's medical records that described Child's injuries as "superficial" and that the injuries did not require "suturing or surgical intervention." Child did not have any permanent injury or any impairment. *Id.* at 12.

The trial court also found that Mother reasonably believed that the injuries were accidental. *Id.* The trial court noted that, because Ms. Rambert was unable to determine the cause of Child's injuries, it would be unreasonable to expect Mother to make that determination when an experienced social worker could not. The trial court found that Mother had

---

[4] Because the trial court found that DHS had not met its burden to demonstrate by clear and convincing evidence that Mother had perpetrated abuse by omission at the close of DHS' case, the trial court directed that Mother did not need to put on a defense. Notes of Testimony ("N.T."), 2/25/2015, at 134.

no knowledge of Father's abuse of Child. Ms. Cassell admitted that she never informed Mother of Father's behavior and that Father acted differently toward Child when Mother was present. *Id.* at 14. Mother also took Child for treatment immediately upon DHS' request and she was cooperative with DHS. *Id.* at 12, 14.

Recently, our Supreme Court decided a case in which the mother was found to have abused her child, either directly or by omission. *In re L.Z.*, 111 A.3d 1164 (Pa. 2015). In that case, the twenty-one month old child was brought to the hospital by the mother and aunt who both cared for the child. The child suffered from "a deep cut nearly halfway around the base of his penis," a dark bruise on each of the child's cheeks, severe diaper rash, and a yeast infection. *Id.* at 1167. In addition, the child was dirty and unkempt. Although the mother and the aunt were the child's primary caregivers, the mother said that the child was in the aunt's care for the two days preceding the hospital visit. *Id.* The treating doctor determined that the child's penile injury was very uncommon, that the facial bruises were a common abuse injury, that the diaper rash and yeast infection were caused by the child being in urine for extended periods of time, and that the injuries caused the child severe pain. The doctor opined that the mother's and the aunt's explanations for the injuries were not credible and that the injuries were "consistent with a pattern of suspected child abuse." *Id.* at 1167-68.

The trial court found that the child was dependent and that the mother and aunt had committed child abuse, determining that, whether or not the

mother inflicted the abuse, she failed to protect the child from the injuries. *Id.* at 1169. On appeal, a majority of this Court, in a split *en banc* decision, affirmed the trial court as to the dependency, but reversed the finding that the mother was a perpetrator of abuse. *Id.* Holding that the penile injury was the only non-accidental serious physical injury, this Court found the record insufficient to demonstrate that the mother was present when that injury occurred. *Id.* at 1170-71. However, the dissenting judges considered the totality of the child's injuries, and would have found that the mother was responsible at least for failing to protect the child. *Id.* at 1171-72.

Our Supreme Court held that the *en banc* majority erred in rejecting the trial court's factual determinations. Specifically, the Court noted that the trial court had made a factual determination that the facial injuries would have caused severe pain based upon the doctor's testimony. Because the trial court observed the doctor and could evaluate the tone and context of the testimony, the *L.Z.* Court held that this Court erred in rejecting that determination. *Id.* at 1174-75.

The Court then proceeded to review the issue of the mother's responsibility for the abuse. In reviewing section 6381, the Court held that the statute extends to acts and omissions and that omissions "encompasses situations where the parent . . . is not present at the time of the injury but is nonetheless responsible due to his or her failure to provide protection for the child." *Id.* at 1184. Because only *prima facie* evidence is required to establish the perpetrator of the abuse:

[E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omission of the parent . . . is sufficient to establish that the parent . . . perpetrated that abuse unless the parent . . . rebuts the presumption. The parent . . . may present evidence demonstrating that [he or she] did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom [he or she] had no reason to fear or perhaps that the injuries were accidental rather than abusive.

*Id.* at 1185. Holding that the trial court did not abuse its discretion in finding the mother's explanations to be incredible and giving credit to the doctor's testimony about the severity of the child's injuries, the Supreme Court reversed this Court's decision and reinstated the trial court's order. *Id.* at 1186.

Applying *L.Z.*, we first note that we must defer to the trial court's factual determinations. Based upon the testimony of Ms. Rambert, Dr. Schilling, and Ms. Cassell, the record provides support for the trial court's conclusion that Mother believed that Child's injuries were accidental. Ms. Rambert testified that she was unsure what caused the injuries without medical input. Dr. Schilling testified that the facial bruise possibly could have occurred from an accidental source. The testimony that Mother believed that the scratches came from the family cat supported the conclusion that Mother had no reason to suspect that Child was being abused by Father. Ms. Cassell testified that Father acted differently around Mother, that Mother was caring with Child, and that Ms. Cassell did not inform Mother about Father's abuse.

The injuries at issue in this case, scratches and bruises, are generally less severe than those where there has been abuse by omission. For example, in *L.Z.*, in addition to the dark facial bruises, the child suffered a deep penile laceration, severe diaper rash, and an untreated yeast infection. *Id.* at 1167. In another case, a child suffered multiple bone fractures. *See In re A.H.*, 763 A.2d 873, 875-76 (Pa. Super. 2000) (holding that the mother either committed the abuse or was responsible for failing to protect the child from her boyfriend). When one child sustained eighteen rib fractures and twelve fractures to her arms and legs and another child sustained seventeen rib fractures, we affirmed a finding of abuse by omission when the mother did not stop the father from committing this abuse. *See In re A.K.*, 906 A.2d 596, 598 (Pa. Super. 2006).

Here, Dr. Schilling described the injuries as "some facial bruising," "multiple lacerations of different stages of healing on her buttocks," "some bruising on the back of her right thigh," and "some linear abrasions [on her arms]." Notes of Testimony ("N.T."), 2/25/2015, at 18, 19, 21, 22. In the medical record, the lacerations were described as "superficial." *Id.* at 64. Dr. Schilling acknowledged that the injuries would have caused pain, but did not opine as to the severity of that pain. Child did not suffer any long-term impairment. *Id.* at 27. There were no injuries to Child's head, bones, or abdominal organs. *Id.* at 28. The only treatment that Child received was antibacterial ointment and Tylenol. *Id.* at 34. Ms. Rambert described the injuries as "scratches" and "bruises." *Id.* at 87.

Based upon all this evidence, the trial court had sufficient support in the record to conclude that these injuries were of the type that Mother could reasonably believe were caused by accidents. The record supports the trial court's conclusion that there was sufficient evidence to rebut the presumption that Mother committed abuse by omission. **See L.Z.**, *supra*. Because there is that support, even though the record could also sustain an opposite finding, we must affirm. **See In re Adoption of S.P.**, *supra*.

DHS and the GAL next argue that the trial court erred in failing to find Child to be dependent. DHS' Brief at 28-32; GAL's Brief at 32-34. DHS argues that Mother did not protect Child, which caused Child to be without proper parental care and control. The GAL asserts that, after the visit to Children's Hospital, and as late as November 2014, Mother did not believe that Father had abused Child. The GAL argues that, if Mother does not believe abuse occurred, Mother would be unwilling to protect Child from future abuse by Father.

Ms. Hardgrove testified that Mother said that "she didn't believe that [Father] actually did it." N.T. at 147. However, Ms. Hardgrove also testified that there was no reason that Child could not be returned to Mother. **Id.** at 146. Thus, there were reasons in the record, in addition to the finding that Mother had not perpetrated abuse, to support the trial court's decision to find Child not to be dependent. Even though there was support in the record for the opposite result, we must affirm when the record supports the trial court. **See In re Adoption of S.P.**, *supra*.

- 18 -

Additionally, at the time of the dependency hearing, Father was in jail, and the court entered a stay away order on behalf of Child against Father. *Id.* at 147. Therefore, the trial court was assured that Father would have no access to Child, regardless of Mother's beliefs. We acknowledge that this was a close case, but the trial court was in the best position to weigh the evidence. We afford great deference to the weight that the trial court puts on that evidence and the record here simply does not support a conclusion that the trial court abused that discretion.

DHS also contends that the trial court erred in returning Child to Mother and dismissing its dependency petition. DHS' Brief at 32-38. Having determined that the trial court did not abuse its discretion by not finding Child to be dependent, we must also conclude that the trial court did not abuse its discretion in returning Child to Mother and dismissing the petition. Because Child was not a dependent child, there was no basis upon which the trial court could sustain the petition or order Child out of Mother's custody.

Finally, Mother filed an "Emergency Motion to Remand Jurisdiction of the Automatic Supersedeas to the Trial Court" on August 17, 2015. On February 27, 2015, we granted supersedeas after a motion by DHS. In Mother's motion, she seeks remand of jurisdiction to the trial court to address the supersedeas. The trial court devoted a large portion of its opinion to this issue. T.C.O. at 15-21. We express no opinion on the application of supersedeas to this case. However, Mother seeks the relinquishment of our jurisdiction over the supersedeas. By disposition of

this appeal, we relinquish jurisdiction of the entire case. Therefore, we deny Mother's motion as moot.

Order affirmed. Motion denied as moot.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2015